**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Mosaic Financial, Ltd. and Accuvest Global Advisors, Inc.,<br><br>        Plaintiff,<br><br>   v.<br><br>Mutual Shareholder Services, LLC, Gregory Getts, Bob Anastasi, and Steven Milcinovic,<br><br>        Defendants. | <u>**COMPLAINT**</u><br><br>**(Jury Trial  Demanded)** |

Plaintiffs Mosaic Financial, Ltd. ("Mosaic")[1] and Accuvest Global Advisors, Inc. ("Accuvest"), through their attorneys, Flannery Georgalis, LLC and Walden Macht & Haran LLP, for their complaint against Mutual Shareholder Services, LLC, Gregory Getts, Bob Anastasi, and Steven Milcinovic, allege as follows:

## PRELIMINARY STATEMENT

1.      Defendants Mutual Shareholder Services, LLC ("MSS"), and its officers and agents Gregory Getts, Bob Anastasi, and Steven Milcinovic (collectively, "Defendants"), were indispensably involved in a scheme to defraud Mosaic and Accuvest out of over $100 million in investments in the Income Collecting 1-3 Months T-Bills Mutual Fund (the "Income Collecting Fund" or simply the "Fund"). Specifically, Defendants, as the Fund's administrators, repeatedly provided false Net Asset Value ("NAV") statements and other Fund information to Mosaic and Accuvest that purported to be accurate and independently verified. Instead, as discussed in detail below, Defendants willfully disregarded numerous red flags related to the Fund's holdings, pretended to be an independent fund administrator while failing to perform its accounting, oversight, or other diligence responsibilities, and instead merely repackaged false information provided by the Fund's founder and manager, Ofer Abarbanel, despite being aware of, and having a duty to be aware of, contradicting account information. Abarbanel has now admitted to perpetrating this fraud, pleaded guilty in the Southern District of New York, and been sentenced to 48 months in prison. Defendants' supposed role as independent fund administrator provided the Fund a veneer of legitimacy that induced Mosaic and Accuvest to entrust money to the Fund, thereby giving life to Abarbanel's fraudulent scheme, at least until he was caught by federal law enforcement.

---

[1] Mosaic is formerly known as Old Fort Financial, Ltd.

2.     Upon information and belief, Abarbanel owned and controlled an investment advisor, New York Alaska ETF Management LLC ("NY Alaska"), a Nevada limited liability company, registered with the U.S. Securities and Exchange Commission ("SEC") as an investment advisor from 2015–2019.[2]

3.     Upon information and belief, at all relevant times, Abarbanel resided in California and operated from California.[3]

4.     Over time, Abarbanel established—and at all relevant times, through NY Alaska, controlled—two investment funds with common management and a common *modus operandi*, both of which are now defunct:

    a.     State Funds – Enhanced Ultra-Short Duration Mutual Fund, a U.S.-based mutual fund registered with the SEC from 2017 through its liquidation in February 2019 ("State Funds"); and, after Abarbanel shut down State Funds and resumed the same fraudulent scheme under a new name,

    b.     The Income Collecting Fund, which is registered in the Cayman Islands (these two together, the "Funds").

5.     Between 2019 and 2021, Mosaic invested over $100 million in the Income Collecting Fund, through its investment advisor, Accuvest. The fraudulent scheme led by Abarbanel, and facilitated by the Defendants, swindled all of it, over $28 million of which still has not been recovered.

---

[2] *See* Amended Complaint, *Securities and Exchange Commission v. Ofer Abarbanel, et al.*, 21-cv-5429 (RA) (hereafter, "Am. SEC Compl.") and August 2020 Prospectus at p. 1-3.

[3] Am. SEC Compl. ¶ 21.

6.     Defendant MSS is an investment fund administrator,[4] fund accountant, and transfer agent,[5] registered since 2007 with the SEC.

7.     MSS advertises on its website and elsewhere that it is "dedicated to providing comprehensive fund accounting and financial reporting services necessary to meet industry requirements" and it "facilitate[s] accurate and timely preparation of all internal and external financial reports essential to the fund's investment advisors."[6]

8.     The Funds represented to potential and actual investors that they hired MSS to provide these fund administration, accounting, and transfer agent services.

9.     At all relevant times, MSS held itself out as, and permitted the Funds to hold MSS out as, an honest and independent source of reliable information about the Funds' holdings and their value.

10.     Within the financial services industry, investors view the involvement of an independent fund administrator as an indication of legitimacy and trustworthiness and view the lack of an independent fund administrator (as was the case, *e.g.*, with the Madoff funds) as a red flag. A *Wall Street Journal* article published in the wake of the Madoff catastrophe explained:

> The Madoff case has rattled many investors, and an increasing number are pressing fund managers to appoint independent administrators to provide an extra level of security against fraud. Many investors and other industry specialists believe that independent

---

[4] In financial services parlance, an "administrator" is "any person who provides significant administrative or business affairs management services to an investment company." 17 CFR § 270.0-1(a)(5).

[5] In financial services parlance, a "transfer agent" is "any person who engages on behalf of an issuer of securities or on behalf of itself as an issuer of securities in (A) countersigning such securities upon issuance; (B) monitoring the issuance of such securities with a view to preventing unauthorized issuance, a function commonly performed by a person called a registrar; (C) registering the transfer of such securities; (D) exchanging or converting such securities; or (E) transferring record ownership of securities by bookkeeping entry without physical issuance of securities certificates." 15 U.S.C. § 78c(a)(25).

[6] Brochure, Mutual Shareholder Services, LLC, available at: http://www.mutualss.com/docs/Brochure.pdf (last accessed Oct. 19, 2023).

> administrators help guard against fraud by serving as a third party responsible for confirming that the hedge fund has the assets it says it does.
>
> Administrators perform day-to-day duties associated with running a fund, such as handling money from new investors and calculating the value of the fund's assets. An administrator calculates the asset value based on data it receives directly from the fund's custodians, such as a bank, which physically holds the shares and other assets owned by the fund.[7]

11.     MSS purported to serve as, and had a duty to serve as, the independent administrator of the Income Collecting Fund. Mosaic and Accuvest relied upon MSS's involvement with the Income Collecting Fund as an indication of the Fund's legitimacy and trustworthiness. Mosaic and Accuvest relied on MSS to truthfully, professionally, and diligently verify, reconcile, and report on the Fund's holdings.

12.     Instead, upon information and belief, MSS looked at daily statements showing that the Income Collecting Fund's holdings were *not* what it reported to Plaintiffs. Specifically, MSS knowingly failed to review and reconcile account statements for the custodian supposedly holding the Income Collecting Fund's most valuable and risky holdings—the securities lending agreements. And yet MSS repeatedly prepared and sent, directly to Mosaic and Accuvest, daily NAV reports regarding the Income Collecting Fund's "GOVBX" share class in which Mosaic had invested (the "NAV Reports") that were false and misleading in reporting fully collateralized securities lending agreements that did not exist.[8]

---

[7] Cassell Bryan-Low, *Swiss Bank UBP, After Big Hit, Takes U.S. Hedge Funds to Task*, Wall Street J. (Jan. 8, 2009).

[8] Securities lending agreements are agreements whereby a lending party loans securities to the borrowing party, who put up collateral (such as cash or other securities) for the loan. The lending party typically collects fees and interest, and the borrowing party may use the borrowed security for various trading activities, such as short selling. Here, the Fund represented that it would lend its securities—which were primarily U.S. Treasury securities—to borrowers in order to earn additional income in the form of borrowing fees.

**The Fraudulent Scheme**

13.    In its prospectuses, the Income Collecting Fund—like State Funds before it—represented that the Fund would invest in "U.S. Treasury securities with 1-3 Months to Maturity" and/or "enter into securities lending, repurchase agreement and/or reverse repurchase agreement transactions that provide the Fund with income at either fixed or floating (variable) interest rates and fees."[9]

14.    These prospectuses represented that these "securities lending agreements" would be collateralized by cash or U.S. Treasury Bills. For instance, the Income Collecting Fund's August 2020 Prospectus provides that:

> Loans will be made only to a counterparty who have been reviewed and deemed satisfactory by NY Alaska ETF Management LP, the Fund's investment adviser (the "Adviser"), pursuant to guidelines adopted by the Board of Trustees (the "Board" or the "Board of Trustees") of the Fund, **and which provide collateral**, **which is secured** to the price performance of either: (i) 100% Cash or 3 Month US T-Bills or (ii) 102%-115% U.S. Treasury securities which the counterparty provides under the settlement terms determined by the Fund.

(emphasis added).[10]

15.    In fact, contrary to these express representations, the Fund took investor money and immediately sent it out to related parties—like a piggy bank for Abarbanel and his co-conspirators—without receiving collateral in the form of cash or U.S. Treasuries, or any collateral at all. When Mosaic became concerned and wanted its money back, the money was not there.

---

[9] *See* August 2020 Income Collecting Funds Prospectus at p. 2.

[10] *See* August 2020 Income Collecting Funds Prospectus at p. 3.

16.     Mosaic and Accuvest received and relied upon the prospectuses—specifically, the representations about MSS's role and the overcapitalization of the Fund's positions—when they made their decisions to invest in the Income Collecting Fund.

17.     The fact of this fraud is beyond dispute. On September 7, 2022, criminal charges were filed against Abarbanel in the U.S. District Court for the Southern District of New York, alleging that he committed Investment Adviser Fraud because he, "in violation of his fiduciary duties, engaged in a scheme to defraud investors and prospective investors in the 'Income Collective 1-3 Months T-Bills Mutual Fund' . . . by making false and misleading statements to them regarding the Fund's investments."[11] That same day, Abarbanel pleaded guilty to Investment Adviser Fraud, admitting that, "[i]n connection with the prospectus for the Income Collecting 1-3 Months T-Bills Mutual Fund, I willfully and knowingly omitted certain material information from the prospectus, rendering the prospectus misleading. I knew I was wrong to deprive [investors] of this information when making their investment decision."[12]

**MSS's Role**

18.     At all relevant times, Mosaic and Accuvest had a reasonable expectation that MSS and its executives, employees, and agents would provide truthful and accurate information regarding the status and valuation of Mosaic's investments in the Income Collecting Fund. Accordingly, MSS, and its agents, Defendants Gregory Getts, Bob Anastasi, and Steven Milcinovic, owed Plaintiffs a duty of care that arose out of their position as the Income Collecting Fund's administrator and their direct and consistent communications with Mosaic and Accuvest regarding Mosaic's investments.

---

[11] Superseding Information, at ¶ 1, *United States v. Abarbanel*, 1:21-cr-532(LAK)(OTW) (S.D.N.Y. 2022), ECF No. 53.

[12] Plea, *United States v. Abarbanel*, 1:21-cr-532(LAK)(OTW) (S.D.N.Y. 2022), Tr. 26:18–23, ECF No. 57.

19.     Nevertheless, MSS directly participated in Abarbanel's fraud by creating and sending false and misleading NAV Reports directly to Mosaic and Accuvest. Specifically, in the guise of a supposedly independent fund administrator, accountant, and transfer agent, MSS provided a patina of legitimacy to the fraudulent scheme while: (1) knowingly disregarding information it reviewed on a daily basis that contradicted its own NAV Reports, (2) failing to request or review documentation substantiating the Income Collecting Fund's purported principal investments, and (3) failing to conduct any due diligence on Abarbanel, his accomplices, the Income Collecting Fund, the counterparties to the Income Collecting Fund's investments, or the valuation of the Income Collecting Fund's holdings.

20.     At all relevant times, Mosaic and Accuvest consistently communicated directly with Milcinovic and MSS regarding Mosaic's investments in and redemptions from the Income Collecting Fund.

21.     From at least June 18, 2019, through June 1, 2021, MSS sent to Mosaic and Accuvest by email at least 450 separate NAV Reports regarding the GOVBX share class. Importantly, Mosaic was the *only* investor in the GOVBX share class.

22.     These emails transmitting the NAV Reports were often sent from an MSS email address (info@mutualss.net), typically copying Defendants Steven Milcinovic and/or Bob Anastasi. Other times, however, the NAV Reports were sent by Milcinovic and/or Anastasi directly to Mosaic and Accuvest. Anastasi was the "Author" (as identified in the metadata) of at least 140 of the NAV Reports that MSS sent to Mosaic and Accuvest.

23.     At all relevant times, nearly all the NAV Reports represented that the Income Collecting Fund held nine- and ten-figure positions in "US Treasuries . . . Lending Secured by

102% 2yr or less Treasuries or Cash held at Wells Fargo and/or IB," with specified interest rates that changed over time. For example:

    a.    On June 18, 2019, MSS sent a NAV Report representing that, on that day, the Income Collecting Fund held $32.5 million in "US Treasuries 4.2% Lending Secured by 102% 2yr or less Treasuries held at Interactive Brokers" that day.

    b.    On June 1, 2021, MSS sent a NAV Report representing that, on May 27, 2021, the Income Collecting Fund held $25.98 million in "US Treasuries 2.45% Lending Secured by 102% 2yr or less Treasuries or Cash held at Wells Fargo and/or IB" on May 27, 2021.

24.    Mosaic and Accuvest reasonably relied upon Defendants' representations in the NAV Reports. Specifically, Mosaic and Accuvest took great comfort that MSS, an independent SEC-regulated third party, confirmed that: (a) the securities lending agreements were *over*-collateralized at 102%; (b) the lending agreements were secured by either cash or U.S. treasuries with short-term maturities; and (c) the collateral was held at one of the Income Collecting Fund's custodian banks, Wells Fargo and/or Interactive Brokers, which MSS was checking daily.

25.    Relying upon Defendants' representations, between approximately March 5, 2019, through February 18, 2021, Mosaic made 20 investments in the Income Collecting Fund's GOVBX share class. The net total of these investments—after occasional redemptions—exceeded $106 million.

26.    Upon information and belief, MSS reviewed and understood the Funds' investment strategy as represented in the prospectuses. MSS was supposed to play a vital role in ensuring that the Funds operated in the manner represented in their prospectuses. State Funds' prospectuses

described MSS as its transfer agent, fund accountant and administrator. Similarly, the Income Collecting Fund's August 2020 Prospectus described MSS as an independent, SEC-registered, and regulated administrator. It stated:

> Mutual Shareholder Services, LLC … serves as the Fund's SEC regulated transfer agent and administrator pursuant to a Fund Accounting Agreement (the "Accounting Agreement"). Under the Accounting Agreement, for the maintenance and operations of the Fund[,] MSS provides necessary accounting, accounting services, and financial reporting under SOC 1 audited standards as well as having the right to view daily bank statements, duel [sic] signatory rights and verifying the fund's activities initiated by the Fund's Investment Manager.[13]

27.     Defendants' misrepresentations in the NAV Reports facilitated the Income Collecting Fund's fraud by hiding the fact that the Income Collecting Fund was materially violating its stated investment strategy.

28.     Abarbanel could not have used the Income Collecting Fund to defraud Mosaic and Accuvest without MSS providing assurance directly to them regarding the Fund's holdings and performance.

29.     Accuvest would not have advised, and Mosaic would not have made or held, these investments in the Income Collecting Fund *but for* the promise of validation and assurance provided by MSS's services as fund administrator, fund accountant, and fund transfer agent, and in particular *but for* the daily NAV Reports that MSS would be providing directly to Accuvest and Mosaic.

30.     MSS and Milcinovic knew or were reckless in failing to know of Abarbanel's misappropriations of Mosaic's funds because they had access to the Income Collecting Fund's

---

[13] "SOC 1 audited standards," which are established by the American Institute of Certified Public Accountants, refers to a suite of reports produced during an audit. They are intended to be used by service organizations when they issue validated reports of internal controls. The reports focus on controls in five categories: security, availability, confidentiality, processing integrity, and privacy.

custodian accounts and account statements, monitored them, and/or spoke with Abarbanel about them.

31.     Yet MSS and Milcinovic never saw a custodian account statement showing that the Income Collecting Fund held securities lending agreements secured by collateral at Wells Fargo or Interactive Brokers because there was no such collateral for any Wells Fargo or Interactive Brokers statement to reflect. Upon information and belief, when they requested such custodian account statements, the Income Collecting Fund provided documents that clearly were not account statements issued by the custodian financial institution, that appeared to contain information that was copied-and-pasted (and possibly edited) from other sources, and that lacked any indicia of reliability.

32.     Despite this, MSS continued to send Mosaic and Accuvest NAV Reports that falsely represented that the Income Collecting Fund held tens and hundreds of millions in collateralized securities lending transactions. Based on their regular communications, MSS knew that Mosaic and Accuvest were relying on such information in making additional cash investments into, and holding their existing investments in, the Income Collecting Fund.

33.     MSS's conduct was an extreme departure from the duty to communicate truthfully, which MSS assumed by sending NAV Reports directly to Mosaic and Accuvest, because the NAV Reports were so manifestly erroneous, and MSS's preparation of them was so highly unreasonable, that MSS either knew or was reckless in not knowing of the danger that false information regarding the Fund's holdings and valuation would induce reliance and cause investment losses.

34.     In addition to making materially false representations to Mosaic and Accuvest, MSS also provided cover for the Income Collecting Fund's fraud by refusing to process Mosaic's redemption request in its capacity as the Income Collecting Fund's transfer agent and keeping

mum regarding the irregular transactions going on behind the scenes (all contrary to the prospectuses and transparent to MSS) while Mosaic was trying to recover its money.

35.     Specifically, upon information and belief, in February 2021, after Abarbanel became aware of parallel SEC and federal criminal investigations into his fraud, Abarbanel forcibly redeemed all investors in the Income Collecting Fund *except Mosaic*. According to the SEC, "[b]ased on financial records and other documents, Abarbanel and a close family member may have been among the investors in the Income Collecting Fund who were redeemed. Abarbanel did not inform [Mosaic] of the SEC's investigation or offer to redeem [Mosaic's] shares of stock in the Income Collecting Fund."[14]

36.     Upon information and belief, this sudden redemption activity was known to MSS because they processed redemptions, yet MSS continued to generate NAV Reports containing materially false and misleading information and send them directly to Plaintiffs as though everything was business as usual. Instead of pausing, confirming the core holdings with each of the custodians, or inquiring of Abarbanel or the investors why everyone was running for the exit, MSS tucked its head in the sand and continued to generate false and misleading NAV Reports and send them to the Mosaic and Accuvest.

37.     On or about May 21, 2021, Mosaic submitted a request to redeem the remainder of its investment, which was over $106 million, to Milcinovic. MSS refused to honor and process this redemption request.

38.     By refusing to process Mosaic's redemption request, MSS provided Abarbanel and the Income Collecting Fund time to raise pretextual roadblocks that delayed the return of Mosaic's money.

---

[14] Am. SEC Compl., ¶¶ 110–112.

39.     Upon information and belief, during this time, Abarbanel attempted to steal Mosaic's money by transferring $74 million of Mosaic's investment to accounts that he and his co-conspirators controlled: first, on June 4, 2021, Abarbanel transferred $64 million of Mosaic's money to the Income Collecting Fund's brokerage account; then, on June 17, 2021, he transferred another $10 million of Mosaic's money to the *personal* brokerage account of Robert Lu, a director of the Income Collecting Fund and its counsel.[15]

40.     The SEC has filed lawsuits and instituted proceedings against the Income Collecting Fund (which is in official liquidation), Abarbanel, other individual participants, certain shell companies that Abarbanel controlled, and two of State Funds' auditors.[16]

41.     Although the SEC was able to recover approximately $80 million, Mosaic has nevertheless lost approximately $23.4 million in principal alone, approximately $5 million of gains and accrued interest reported in MSS's NAV Reports, approximately $1 million in advisory fees, and over $1 million in legal fees. In addition, Accuvest has suffered over $570,000 in lost advisory fees and costs and fees related to the government and other investigations into the fraudulent scheme and over $40,000 in legal fees.

---

[15] Am. SEC Compl. ¶ 16; Consent Order Temporarily Lifting Asset Freeze for Transfer of Non-Fund Assets (ECF No. 29), *Securities and Exchange Commission v. Ofer Abarbanel, et al.*, 21-cv-5429(RA).

[16] *See, e.g.*, *SEC v. Abarbanel*, No. 21-cv-5429(RA), Judgment as to Defendant Victor Chilelli (Feb. 25, 2022); In the Matter of BrookWeiner, LLC; James E. Schmidt, CPA; and Cheldon Weiner, CPA, Securities Exchange Act Release No. 95958 (Sept. 30, 2022) (settlement with auditor related to 2017 State Funds' audit); In the Matter of Berkower LLC; Michael G. Mullen, CPA, Maurice Berkower, CPA, Securities Exchange Act Release No. 95959 (Sept. 30, 2022) (settlement with auditor related to 2018 State Funds' audit); *SEC v. Abarbanel*, 21-cv-5429(RA), Final Judgment as to Defendant Income Collecting 1-3 Months T-Bills Mutual Fund (In Official Liquidation) (Jan. 31, 2022); In the Matter of Nicholas Abbate, Securities Act Release No. 11019 (Dec. 21, 2021) (settlement with officer of Income Collecting Funds, who previously served as COO and Portfolio Manager of State Funds and Portfolio Manager for NY Alaska).

## JURISDICTION AND VENUE

42.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 15 U.S.C. § 78aa(a). This Court also has supplemental jurisdiction under 28 U.S.C. § 1367.

43.     Venue is proper in this District under 28 US.C. §1391(b)(1), (2) and 15 U.S.C. §78aa(a) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Moreover, MSS is headquartered in, and has its principal place of business, in this District.

## PARTIES

44.     Plaintiff Mosaic (as well as its predecessor, Old Fort Financial Ltd.) is a broker dealer formed and registered, and with a principal place of business, in the Bahamas. Mosaic provides wealth management services to individual and institutional clients. From about 2017 through 2019, Mosaic invested in State Funds. From about 2019 through 2021, Mosaic invested in the Income Collecting Fund. Mosaic received NAV Reports—directly and through its advisor, Accuvest—sent by MSS regarding the Income Collecting Fund's GOVBX share class.

45.     Plaintiff Accuvest is an investment advisory firm incorporated and with a principal place of business in Utah. Accuvest manages a variety of global portfolios for a global investor base. Accuvest advised Mosaic in its investment in the Funds.

46.     Defendant MSS is an SEC-registered transfer agent formed in Delaware, with a principal place of business in Broadview Heights, Ohio, within the Northern District of Ohio. MSS provides financial reporting, fund accounting, fund administration, reporting and control, shareholder servicing, and transfer agency services to small and medium sized investment funds.

47.     Throughout the period of approximately March 2017 through June 2021, MSS acted as the fund administrator, fund accountant, and transfer agent for State Funds and the Income Collecting Fund.[17]

48.     As of January 2020, the Income Collecting Fund paid MSS at least $4,800 per month in accounting fees and transfer agent fees.

49.     Defendant Gregory Getts is the owner of MSS. According to MSS's Form T-1 (filed 3/26/2007), Getts is a control person of MSS as defined by Section 20(a) of the Exchange Act. According to MSS's Compliance Manual, Getts is the Chief Compliance Officer "responsible for ensuring that MSS and its employees performed their responsibilities in a Rule 38a-1 compliant manner that meets the requirements in federal, state, regulatory agencies and security laws."

50.     Defendant Bob Anastasi is a Vice President at MSS. He was the "Author" (according to the metadata) of at least 140 of the NAV Reports that MSS sent to Mosaic and/or Accuvest. Upon information and belief, Anastasi was involved in calculating the trial balance of the Income Collecting Fund.

51.     Defendant Steven Milcinovic is a Mutual Fund Administrator at MSS. He was the primary contact at MSS with whom Mosaic and Accuvest communicated about Mosaic's investment in the Income Collecting Fund. The Income Collecting Fund's prospectuses dated June

---

[17] *See, e.g.*, State Funds' March 2017 Prospectus ("Under the Accounting Agreement, MSS provides necessary accounting, accounting services, and financial reporting for the maintenance and operations of the Trust. . . . MSS also serves as the Fund's transfer agent pursuant to a Transfer Agent Servicing Agreement."); Income Collecting Fund's February 2019 Prospectus ("Under the Accounting Agreement, MSS provides necessary accounting, accounting services, and financial reporting for the maintenance and operations of the Fund. In addition, MSS makes available the office space, equipment, personnel and facilities required to provide such services."); Income Collecting Fund's June 2019 Prospectus ("Under the Accounting Agreement, for the maintenance and operations of the Fund; MSS provides necessary accounting, accounting services, and financial reporting as well as has signatory rights on payments made on behalf of the Fund which are initiated by the Fund's Investment Manager. . . . MSS is a Euroclear Fundserve platform member that serves as the Fund's transfer agent pursuant to a Transfer Agent Servicing Agreement.").

2019 and August 2020 identify Milcinovic as the individual whom investors should contact to buy and redeem shares in the Income Collecting Fund.

52.     At all relevant times, and in all relevant respects alleged herein, Getts, Anastasi, and Milcinovic acted as MSS's representatives and agents.

## RELATED PERSONS

53.     Nicholas Abbate was the Chief Operating Officer and Portfolio Manager for State Funds, and Chief Investment Officer and Portfolio Manager for NY Alaska from approximately 2016 to 2019. From approximately 2020 to 2021, Abbate was the Money Laundering Reporting Officer for the Income Collecting Fund.

54.     Victor Chilelli was Portfolio Manager for NY Alaska from approximately 2015 until November 2016.[18] He was the Deputy Compliance Officer for State Funds from approximately 2015 until October 2017.[19]

55.     In or about October 2017, Chilelli formed two companies, North American Liquidity Resources LLC ("NALR") and Institutional Syndication LLC ("IS"). Upon information and belief, the Income Collecting Fund fraudulently transferred over $104 million of Mosaic's investment funds to NALR and IS in unsecured and unauthorized loans.[20]

## ALLEGATIONS OF FACT

56.     From at least March 2017 through June 2021, Abarbanel orchestrated a scheme to deceive and defraud investors in two mutual funds that Abarbanel formed and controlled: (a) State Funds, which was registered in the United States, and (b) the Income Collecting Fund, which was based in the Cayman Islands.

---

[18] Am. SEC Compl. ¶ 22.

[19] Am. SEC Compl. ¶ 22.

[20] Am. SEC Compl. ¶¶ 26-27.

57.     MSS directly participated in defrauding Mosaic and Accuvest by knowingly or recklessly communicating false and misleading information about the Income Collecting Fund's holdings in NAV Reports that MSS prepared and sent directly to Mosaic and Accuvest.

**A.      Mosaic Invested in State Funds for the Conservative Investment Strategy State Funds Falsely Promised in Its Prospectuses**

58.     Abarbanel and NY Alaska operated State Funds from approximately March 2017 through February 2019.

59.     During this time, Abarbanel sent State Funds' prospectus to Mosaic and Accuvest.

60.     In its prospectuses, State Funds represented to Mosaic and Accuvest that it had a conservative investment strategy based on investments involving U.S. Treasury securities.

61.     For example, State Funds' prospectus dated March 15, 2017 (the "March 2017 Prospectus") represented that it followed this investment strategy:

> Under normal market conditions, the Fund primarily invests its net assets (exclusive of proceeds (collateral) received with respect to securities lending, repurchase agreements and reverse repurchase agreement transactions) in U.S. Treasury securities, which include bills, notes, and bonds issued by the U.S. Treasury, that have remaining maturities of three months.

62.     This representation induced Mosaic and Accuvest to invest in State Funds because U.S. Treasury securities—which are backed by the full faith and credit of the U.S. government—are widely considered the safest and lowest-risk investment an investor can make.

63.     In the March 2017 Prospectus, State Funds also represented that, in addition to investing in U.S. Treasury securities, it may "enter into securities lending, repurchase agreement and/or reverse repurchase agreement transactions that provide the Fund with income at either fixed or floating (variable) interest rates and fees."

64.     The Securities Industry and Financial Markets Association describes repurchase and reverse repurchase agreements as follows:

17

A repurchase agreement (repo) is a financial transaction in which one party sells an asset to another party with a promise to repurchase the asset at a pre-specified later date (a reverse repo is the same transaction seen from the perspective of the security buyer). . . . The repo market enables market participants to provide collateralized loans to one another, and financial institutions predominantly use repos to manage short-term fluctuations in cash holdings, rather than general balance sheet funding. . . . The repo markets allow investors to manage excess cash balances safely and efficiently. Dealers also benefit from significantly reduced funding costs, the capacity to finance long positions in securities and the ability to borrow securities to cover short positions to satisfy client needs. Long holders of securities can also gain incremental returns by engaging in repo transactions with cash investors for securities they own but have no immediate need to sell. . . . Repos offer cash providers collateralization (with additional margin requirements in most cases) marked-to-market daily to ensure continuing protection.[21]

65.     The Securities Industry and Financial Markets Association further explains the nature of transactions between lenders and borrowers of securities:

The bilateral repo market has investors and collateral providers directly exchange money and securities, absent a clearing bank. Bilateral repo transactions can either allow for general collateral or impose restrictions on eligible securities for collateral. Bilateral repo is preferred when market participants want to interact directly with each other or if specific collateral is requested.[22]

66.     Such positions are marked-to-market daily to ensure that sufficient collateral has been provided by the borrower. The value of the collateral, together with the rate of return, is what gives value to the security.

67.     The NAV of an investment fund engaged in repurchase and reverse repurchase securities lending depends critically on the value of these agreements; the value of these

---

[21] SIFMA, US Repo Market Fact Sheet (April 2020), available at https://www.sifma.org/wp-content/uploads/2020/04/2020-Repo-Factsheet_final2.pdf.

[22] Id.

agreements, in turn, depends critically on the nature of the collateral, including:  its value; the fund's perfected security interest in it; its safekeeping with a custodian; and its liquidity.

68.     State Funds claimed that the counterparties to those securities lending, repurchase, and/or reverse repurchase agreements would be "broker/dealers, institutional investors, institutional investment manager(s), banks, mutual funds, and insurance and/or reinsurance companies located in one of the member countries of The Organization for Economic Co-operation and Development" that were deemed satisfactory by NY Alaska, pursuant to guidelines adopted by State Funds' Board of Trustees. These counterparties would "provide collateral, which is either (i) 102% cash or (ii) 102%-115% U.S. government securities."

69.     In other words, the counterparties of any State Funds securities lending transaction would be vetted, established, well-funded, creditworthy financial institutions.

70.     State Funds retained MSS to provide various services, including communicating with investors, such as Mosaic, about investment subscriptions and redemptions. State Funds' March 2017 Prospectus described MSS as its "transfer agent" and identified MSS as the party to whom communications regarding investment redemptions should be directed.

71.     State Funds' March 29, 2018 Form N-1A Registration Statement, which was publicly filed with the SEC, included a copy of a July 18, 2016 Accounting and Administration Services Agreement between State Funds and MSS (the "2016 Accounting Agreement").[23]

72.     MSS's responsibilities under the 2016 Accounting Agreement included, among other things, "[c]alculat[ing] the net asset value per share with the frequency prescribed in each Fund's then-current Prospectus"; "[c]alculat[ing] each item of income, expense, deduction, credit, gain and loss, if any, as required by the Trust and in conformance with generally accepted

---

[23] EX-99.H OTH MAT CONT 56 state485bposexh2201803.htm, available at:
https://www.sec.gov/Archives/edgar/data/1679960/000116204418000223/state485bposexh2201803.htm.

accounting principles ('GAAP'), SEC Regulation S-X (or any successor regulation) and the Internal Revenue Code of 1986, as amended (or any successor laws)(the 'Code')"; and "[p]rovid[ing] the Trust and its investment adviser with daily portfolio valuation, net asset value calculation and reconcile all appropriate data with each Fund's custodian/custodians and other standard operational reports as requested from time to time and  make such adjustments over such periods as the Trust deems necessary, and management."

73.    State Funds' March 29, 2018 SEC filing also included, among other things, a July 18, 2016 Transfer Agent Agreement between State Funds and Defendant MSS.[24]

74.    Based on State Funds' representations regarding its conservative investment strategy, and its retention of MSS, which promised oversight by an independent third-party regulated professional, Mosaic invested approximately $30 million in State Funds from about 2017 to 2019.

75.    Specifically, on July 27, 2017, Mosaic submitted its application to invest in State Funds to Abarbanel and Milcinovic.

76.    However, State Funds' representations regarding its investment strategy were false. Instead of entering repurchase agreements and reverse repurchase agreements with independent financial institutions, upon information and belief, State Funds defrauded its investors by entering unauthorized, uncollateralized securities lending transactions with counterparty shell companies that Abarbanel and/or Chilelli created and controlled.[25]

---

[24] EX-99.H OTH MAT CONT 55 state485bposexh1201803.htm, available at:
https://www.sec.gov/Archives/edgar/data/1679960/000116204418000223/state485bposexh1201803.htm.

[25] Am. SEC Compl. ¶¶ 59-63.

77.     Upon information and belief, Abarbanel transferred investor funds—including those of Mosaic—to brokerage accounts that he controlled, from which he engaged in risky investments (including transacting on margin in U.S. securities) and accrued significant losses.[26]

78.     Upon information and belief, MSS reviewed certain State Funds prospectuses and commented on the application of certain SEC rules to the prospectuses. For example, on January 4, 2019, Milcinovic proposed language to Abarbanel for inclusion in a State Funds prospectus.

**B.     In 2019, Abarbanel Wound Down State Funds and Resumed the Same Scheme Using the Income Collecting Fund**

79.     Upon information and belief, and unbeknownst to Plaintiffs, in about February 2019, other investors made inquiries to State Funds about its investment activities. To avoid further scrutiny, Abarbanel closed State Funds and transferred his fraudulent operations to the Income Collecting Fund, which was based in the Cayman Islands.[27]

80.     In February 2019, when winding down State Funds' operations, Abarbanel and NY Alaska forced Mosaic to redeem its shares of State Funds, closed out its investment, and encouraged it to reinvest the funds in the Income Collecting Fund. Mosaic, unaware of the investor inquiries or State Funds' fraudulent scheme, did so.

81.     Upon information and belief, Abarbanel lacked sufficient assets to provide full redemptions to State Funds' investors due to his investment losses. As a result, he "had to commingle and misappropriate new funds invested by Income Collecting Fund investors [including Mosaic] in order to pay off the older State Funds investors."[28]

---

[26] Am. SEC Compl. ¶ 69.

[27] Am. SEC Compl. ¶ 5.

[28] Am. SEC Compl. ¶ 6.

82.     Upon information and belief, and as described below, Abarbanel used the Income Collecting Fund to continue the fraud he started with State Funds.[29]

**C.     The Income Collecting Fund Continued State Fund's Fraudulent Scheme**

**i.      The Income Collecting Fund's Prospectuses' Representations**

83.     Upon information and belief, in January 2019, when Abarbanel was preparing to move his fraudulent scheme to the Cayman Islands, he created a prospectus on behalf of the Income Collecting Fund and made it available to investors and potential investors, including Mosaic and Accuvest, on the Income Collecting Fund's website.[30]

84.     Upon information and belief, Abarbanel updated the Income Collecting Fund's prospectus with minor modifications at least nine times between February 2019 and August 2020.[31]

85.     Mosaic and Accuvest accessed and reviewed the Income Collecting Fund's Prospectus, dated January 2019 (the "January 2019 Prospectus"), which represented that "[u]nder normal market conditions, the [Income Collecting] Fund invests its net assets primarily (exclusive of collateral with respect to securities lending and reverse repurchase agreement transactions) in U.S. Treasury securities, which include bills, notes, and bonds issued by the U.S. Treasury, that have remaining maturities of greater than or equal to one month and less than three months." The January 2019 Prospectus further represented that that "[a]ll of the [Income Collecting] Fund's assets will be invested in U.S. dollar-denominated securities."

86.     The January 2019 Prospectus also represented that "[i]n order to enhance income, the [Income Collecting] Fund intends to enter into securities lending, repurchase agreement and/or

---

[29] Am. SEC Compl. ¶¶ 7-8.

[30] Am. SEC Compl. ¶ 84.

[31] Am. SEC Compl. ¶¶ 85-86.

reverse repurchase agreement transactions that provide the [Income Collecting] Fund with income at either fixed or floating (variable) interest rates and fees."

87.     The January 2019 Prospectus represented that the counterparties of such repurchase and reverse repurchase agreements would be "broker/dealers, institutional investors, institutional investment manager(s), banks, mutual funds, and insurance and/or reinsurance companies located in one of the member countries of the OECD."

88.     In addition to the January 2019 Prospectus, Mosaic and Accuvest also accessed and reviewed the updated versions of the prospectus dated February 2019, June 2019, and August 2020 (respectively, the "February 2019 Prospectus," "June 2019 Prospectus," and "August 2020 Prospectus"). The February 2019 Prospectus, June 2019 Prospectus, and August 2020 Prospectus contained the same material terms and representations as the January 2019 Prospectus.

89.     As described below, the January 2019 Prospectus, February 2019 Prospectus, June 2019 Prospectus, and August 2020 Prospectus were all materially false and misleading because they did not disclose that the Income Collecting Fund had entered, and would continue to enter, into unsecured, uncollateralized loan transactions with related parties.

90.     The Income Collecting Fund also published monthly fact sheets (the "Fact Sheets") from about March 2019 through at least February 2021, which also did not disclose that the Income Collecting Fund had entered, and would enter, into unsecured and uncollateralized loan transactions with related parties.

91.     Moreover, the April 30, 2021 Fact Sheet represented that "[t]he Collateral is marked to market daily which means the fund uses a daily collateral settlement method which ensures that the fund will always have excess collateral (over-collateralized) to secure its activity." Upon information and belief, the other Fact Sheets made similar representations.

ii.     **The Representations in the Income Collecting Fund's Prospectuses and Fact Sheets, Upon Which Mosaic and Accuvest Relied, Were False and Fraudulent**

92.     From March 2019 through February 2021, Mosaic—relying on the Income Collecting Fund's representations regarding its conservative investment strategy and MSS's representations regarding the Income Collecting Fund's holdings and performance—invested approximately $191 million in the Income Collecting Fund and redeemed approximately $85 million.

93.     Accuvest—relying on the Income Collecting Fund's representations regarding its conservative investment strategy and MSS's representations regarding the Income Collecting Fund's holdings and performance—advised Mosaic on these investments.

94.     All or nearly all of Mosaic's investments in the Income Collecting Fund originated from Mosaic's account at BNY Mellon in New York, NY and Mosaic's redeemed funds were returned to its bank account at BNY Mellon in New York, NY.

95.     Although the Income Collecting Fund did invest *some* of its assets in U.S. Treasury securities, including bills, notes, and bonds issued by the U.S. Treasury, that had remaining maturities of greater than or equal to one month and less than three months, it did not *primarily* invest in these U.S. treasuries, as it had described in the January 2019 Prospectus, February 2019 Prospectus, June 2019 Prospectus, and August 2020 Prospectus, and the Fact Sheets. Upon information and belief, these small investments were simply cover, populating brokerage account statements and NAV Reports with some semblance of the expected fund investments.

96.     Upon information and belief, in 2019, the Income Collecting Fund invested less than 2% of its assets in U.S Treasury Bills and nearly 98% of its assets in purported "Securities Lending Agreements."

97.     Upon information and belief, Abarbanel, NY Alaska, and Chilelli used the Income Collecting Fund to engage in a similar fraudulent scheme as State Funds: they used the Income Collecting Fund to misappropriate investor assets through a fraudulent course of conduct that included: (a) creating nominee shell companies; (b) diverting investor funds to these shell companies in unauthorized, uncollateralized loan transactions that violated the terms set forth in the Income Collecting Fund's public filings and prospectuses; and (c) submitting false and misleading statements of material facts to investors, including Mosaic and Accuvest.[32]

98.     Upon information and belief, the Income Collecting Fund misappropriated investor funds to make unauthorized and uncollateralized loans to IS, a New Jersey registered company operated by Chilelli, and NALR, a Nevada registered company managed by James Guandique and Chilelli.[33] For example, on June 27, 2019, Guandique sent to the Income Collecting Fund, copying Milcinovic, a signed lending agreement for $16 million. The Income Collecting Fund received this signed lending agreement nearly 4 hours after it notified Milcinovic that it had loaned $16 million to NALR.

99.     Upon information and belief, IS and NALR were single-member shell companies with no assets, operations, or business purpose other than to facilitate the unauthorized investment, transfer, and misappropriation of investor funds (IS and NALR hereinafter, the "Counterparty Shells").[34]

100.    Upon information and belief, the Counterparty Shells were set up and, at all relevant times, operated by Victor Chilelli, a resident of Delaware, who resided until 2020 in New York.[35]

---

[32] Am. SEC Compl. ¶¶ 2, 16.

[33] Am. SEC Compl. ¶¶ 4–6, 12, 92-94.

[34] Am. SEC Compl. ¶ 91.

[35] Am. SEC Compl. ¶¶ 22, 26-27.

101.    Upon information and belief, in addition to the Counterparty Shells, Abarbanel and Chilelli formed, controlled, and/or operated at least four other shell companies to receive, hold, transfer, and misappropriate investors' assets in furtherance of the scheme:  Institutional Secured Credit LLC, Growth Income Holdings LLC, CLO Market Neutral LLC, and Global EMEA Holdings LLC (these four entities hereinafter, the "Trading Shells").[36]

102.    Upon information and belief, the purpose of the fraudulent scheme that Abarbanel and Chilelli orchestrated was "to engage in various securities transactions for their own benefit," which "were often high-risk and volatile, often on margin, and often employed volatile, high-risk futures-options trading strategies."[37]

103.    The Income Collecting Fund's scheme to misappropriate investor funds and engage in unauthorized and uncollateralized loans with the Counterparty Shells rendered its prospectuses materially false and misleading.

**D.    MSS Facilitated the Income Collecting Fund's Fraud by Making Material Misrepresentations to Mosaic and Accuvest**

**i.    MSS's Role as a Third-Party Administrator for the Income Collecting Fund**

104.    The Income Collecting Fund held MSS out as an independent and trustworthy administrator. The January 2019 Prospectus and February 2019 Prospectus identified MSS as the Income Collecting Fund's "SEC regulated Administrator pursuant to a Fund Accounting Agreement" and represented that MSS's responsibilities included the following:

    a.    "MSS provides necessary accounting, accounting services, and financial reporting for the maintenance and operations of the Fund";

---

[36] Am. SEC Compl. ¶¶ 13, 28-30.

[37] Am. SEC Compl. ¶ 104.

b.  "MSS makes available the office space, equipment, personnel and facilities required to provide such services"; and

c.  "MSS provides persons satisfactory to the Board to serve as officers of the Fund."[38]

105.  The June 2019 Prospectus made materially similar representations as the January 2019 Prospectus and February 2019 Prospectus and, in addition, claimed that "MSS is a Euroclear Fundserve platform member that serves as the Fund's transfer agent pursuant to a Transfer Agent Servicing Agreement."

106.  The August 2020 Prospectus made the same material representations as the June 2019 Prospectus and, in addition, represented that "MSS provides necessary accounting, accounting services, and financial reporting under SOC 1 audited standards as well as having the right to view daily bank statements, duel [sic] signatory rights and verifying the fund's activities initiated by the Fund's Investment Manager."

107.  Indeed, MSS acted as the Income Collecting Fund's transfer agent when it received and processed Mosaic's investment subscriptions and redemption requests. Mosaic communicated with Milcinovic specifically—as the Income Collecting Fund's prospectus instructed—about its investment subscriptions and redemption requests.

108.  Upon information and belief, MSS possessed, reviewed, and commented on the Income Collecting Fund's prospectuses and was aware of the representations within them concerning MSS.

109.  Upon information and belief, the "Fund Accounting Agreement" between the Fund and MSS that was referenced in the January 2019 Prospectus (and subsequent updates) was a June

---

[38] January 2019 Income Collecting Fund Prospectus.

15, 2018 Accounting and Administration Services Agreement (the "2018 Accounting Agreement").

110.    Upon information and belief, pursuant to the 2018 Accounting Agreement, MSS was responsible for performing the following services:

    a.    "Timely calculate the net asset value per share" and "transmit the Fund's net asset value to the Fund and its transfer agent";

    b.    "Calculate each item of income, expense, deduction, credit, gain and loss, if any, as required by the Fund and in conformance with generally accepted accounting principles ('GAAP'), SEC Regulation S-X (or any successor regulation) and the Internal Revenue Code of 1986";

    c.    "Prepare and Maintain and keep current all books and records of the Fund as required by Rule 31 a-1 under the 1940 Act . . . . Without limiting the generality of the foregoing, MSS will prepare and maintain the following records upon receipt of information in proper form from the Fund or its authorized agents:"  (i) purchase and sales journals, (ii) security ledgers, (iii) broker ledgers, (iv) general ledgers, and (v) securities and monies borrowed or loaned and related collateral"; and

    d.    **"Provide the Fund and its investment adviser with daily portfolio valuation, net asset value calculation and reconcile all appropriate data with <u>each</u> Fund's custodian/custodians . . . ."** (emphasis added).

111.    Upon information and belief, under the 2018 Accounting Agreement, MSS was also contractually obligated to:

a.    "Provide Access to selected management reports for performance analyses agreed upon by the Fund and MSS from time to time";

b.    "In consultation with legal counsel for the Fund, assist in and monitor the preparation, filing, printing and where applicable, dissemination to shareholders of the following:

   i.    amendments to the Fund's Registration Statement;

   ii.    periodic reports to the Fundees [sic], shareholders and the SEC, including but not limited to annual reports and semi-annual reports;

   iii.    notices pursuant to Rule 24f-2 (as applicable);

   iv.    proxy materials";

c.    "Coordinate the Fund's audits and examinations by:

   i.    assisting each Fund's independent public accountants, or, upon approval of the Fund, any regulatory body, in any requested review of a Fund's accounts and records;

   ii.    providing appropriate financial schedules (as requested by a Fund's independent public accountants or SEC examiners); and

   iv.    providing office facilities as may be required."

d.    "Prepare, or cause to be prepared, expense and financial reports, including Fund budgets, expense reports, pro-forma financial statements, expense and profit/loss projections and fee waiver/ expense reimbursement projections on a periodic basis";

e.    "Subject to the Fund's approval provided in advance and in writing, provide information typically supplied in the investment company

industry to companies that track or report price, performance or other information with respect to investment companies"; and

f.    "Perform other services, recordkeeping and assistance relating to the affairs of the Fund as the Fund may, from time to time, reasonably request pursuant to mutually acceptable timelines and compensation agreements."

112.    The August 2020 Prospectus represents that MSS, "[t]he SEC Regulated Administrator[,] is also required to ensure full compliance with all applicable Cayman Islands laws and regulations relating to money laundering and terrorist financing."

113.    Upon information and belief, MSS represented to its clients (including funds subject to SEC Rule 38a-1) that its operations satisfied SEC Rule 38a-1 and did so because registered funds are required to "adopt and implement written policies and procedures reasonably designed to prevent violation of the Federal Securities Laws by the fund, including policies and procedures that provide for the oversight of compliance by each investment adviser, principal underwriter, administrator, and transfer agent of the fund."[39]

114.    Getts delegated this responsibility to an in-house lawyer and Milcinovic, but upon information and belief, he was unaware of what that responsibility required or how anyone at MSS satisfied it.

115.    In other words, MSS dressed up like a legitimate fund administrator and transfer agent to sell its services to funds, but these trappings of independence, assurance, and internal controls were a sham. Abarbanel and the Income Collecting Fund could not have perpetuated their fraud on Mosaic and Accuvest without MSS playing this role of a faux gatekeeper.

---

[39] 17 C.F.R. § 270.38a-1(a)(1)

116.    MSS knew that the Income Collecting Fund was an offshore entity.

117.    Yet MSS failed to conduct any due diligence on Abarbanel before agreeing to serve NY Alaska and State Fund as clients.

118.    MSS also failed to conduct any due diligence on the Income Collecting Fund, even after Abarbanel forced redemptions of all investors from State Fund and re-enrolled Mosaic in the Income Collecting Fund.

**ii.     MSS Knew or Was Reckless in Failing to Know that the Representations in the Income Collecting Fund's Prospectuses Were False and Fraudulent**

119.    MSS reviewed and commented on the Confidential Private Placement Memorandum of the Income Collecting Fund.

120.    MSS, Getts, and Milcinovic were aware that the Income Collecting Fund purported to enter into reverse repurchase agreements, and that reverse repurchase agreements required transfer of title to collateral from the borrowing party to the lending party.

121.    But MSS did nothing to review the securities lending agreements entered into by the Income Collecting Fund, understand the collateral requirements, or take any steps to verify that their terms were followed.

122.    MSS failed to verify whether any collateral was ever transferred to the Fund; failed to review the basic terms of the securities loan agreements; and failed to understand the identity or creditworthiness of the counterparties.

123.    Moreover, MSS did nothing to verify whether the securities lending agreements entered into by the Income Collecting Fund abided by the February 2019, June 2019, and August 2020 Prospectuses, which, upon information and belief, MSS reviewed.

124.    The January 2019 Prospectus and subsequent updates represented that "[l]oans will be made only to a counterparty who have been reviewed and deemed satisfactory by NY Alaska

ETF Management, the Fund's investment adviser . . . pursuant to guidelines adopted by the Board

of Trustees . . . of the Fund, and which provide collateral, which is secured to the price performance

of either: (i) 100% units of mutual fund symbol: STATX or (ii) 102%-115% U.S. Treasury

securities."

125.    The February 2019 Prospectus and June 2019 Prospectus changed the collateral

requirement to either "100% units of mutual fund symbols: STATX or of this Fund" or "102%-

115% U.S. Treasury securities."

126.    The August 2020 Prospectus changed the collateral requirement to either "100%

Cash or 3 Month US T-Bills" or "102%-115% U.S. Treasury securities which the counterparty

provides under the settlement terms determined by the Fund."

127.    The representations contained in the January 2019 Prospectus and subsequent

updates regarding the collateral the Fund received and would receive in reverse repurchase

agreements were materially false and misleading, because, in practice, the purported reverse

repurchase agreements with the Counterparty Shells involved neither the lending nor sale of

securities with an agreement to repurchase the securities at an agreed upon price, date and interest

payment, nor the pledging of collateral in the form of mutual fund shares or Treasuries.[40] MSS

knew or was reckless in not knowing this because it conducted a daily review and reconciliation

of the custodian accounts that were supposed to be holding the collateral.

128.    Upon information and belief, the Income Collecting Fund transferred the majority

of Mosaic's investment to the Counterparty Shells through unauthorized, unsecured, and

uncollateralized loans. From March 2019 through November 2020, Abarbanel caused the Income

Collecting Fund to transfer at least $104 million worth of Mosaic's deposits into accounts held

---

[40] Am. SEC Compl. ¶ 92.

by the Counterparty Shells.[41]  Specifically, Abarbanel caused the transfer of approximately $2.03 million of Mosaic's investment into IS' accounts[42] and $102 million of Mosaic's investment into NALR accounts.[43]

### iii. MSS, Anastasi, and Milcinovic Sent Mosaic and Accuvest the NAV Reports That Misrepresented the Income Collecting Fund's Holdings

129.    MSS, Anastasi, and Milcinovic prepared NAV Reports related to the Income Collecting Fund's GOVBX share class on a daily basis. The NAV Reports made representations regarding GOVBX's NAV, holdings, and unrealized gains and losses.

130.    On June 17, 2019, the Operations Team at the Income Collecting Fund sent an email to Mosaic (then d/b/a/ Old Fort) regarding the NAV Reports:

> Under the fund's privacy policy, we are required to confirm with you whether you allow Accuvest Global advisors to receive daily statements directly from the fund's SEC regulated Transfer Agent and Fund administrator named Mutual Shareholder Services LLC which have their own set of privacy & AML policies – ex: https://www.sec.gov/Archives/ed-gar/data/1222705/000116204403000080/exhibitam.htm

> Mutual Shareholder Services LLC ("MSS") daily reporting is Au-dited (attached Audit Report) + supervised by the SEC + conducted for many other funds, here is a partial list: http://www.mutu-alss.com/currentprices.aspx + attached an example of the daily re-port

> Our Request – Do you allow the fund and MSS to send the daily fund report to Accuvest Global Advisors to their following email: operations@accuvest.com

131.    Later that same day, Mosaic responded to confirm that Accuvest was authorized to receive the daily NAV Report.

---

[41] Am. SEC Compl. ¶ 102.

[42] Am. SEC Compl. ¶ 26.

[43] Am. SEC Compl. ¶ 27.

132.    Upon information and belief, the Income Collecting Fund communicated Mosaic's authorization to MSS, for shortly thereafter, MSS began sending the NAV Reports directly to Accuvest.

133.    By agreeing to send its NAV Reports directly to Accuvest and Mosaic, MSS accepted a new set of duties. MSS accepted the trust and confidence that Accuvest and Mosaic reposed in it and sent hundreds of NAV Reports to them, knowing that Accuvest and Mosaic would rely on them because MSS was supposed to be independently maintaining and validating the Fund's books and records and valuation reports.

134.    According to MSS's Fund Accounting Policies and Procedures MSS prepares NAV reports using its proprietary software and sends NAV reports to fund advisors and others (such as Mosaic) using a special email program.

135.    MSS purports to ascertain the NAVs of the Fund by monitoring the fund accounts (for example, bank, trust, and brokerage) that hold fund assets. In this case, MSS had access to fund account statements for the Income Collecting Fund.

136.    MSS purports to verify the accuracy of its NAV Reports by getting prices of the underlying securities and making sure that the portfolio matches the information Abarbanel provided on fund investments.

137.    But none of this is true—MSS simply put whatever fabrication Abarbanel sent to MSS into the NAV Reports, even when that information contradicted account statements that Milcinovic reviewed on a daily basis. MSS then sent those worthless NAV Reports directly to Mosaic and Accuvest in MSS's own name, purportedly acting as an independent fund administrator and SEC-registered transfer agent.

138.    MSS knew that Mosaic, through its investment advisor Accuvest, relied upon MSS's NAV reports in its investing decisions.

139.    After Mosaic made investing decisions, MSS executed such decisions using its false NAVs to convert the dollar amount of the investment to the equivalent GOVBX share size. As a result of MSS's overstated NAVs, it greatly diminished the share size of Mosaic's investments and redemptions. For example, on November 16, 2020, Mosaic sent a request to MSS to redeem $2 million "for tomorrows [*i.e.*, November 17, 2020] value date." The next day, MSS sent Accuvest a NAV Report, falsely representing that GOVBX held $106.53 million in "US Treasuries 2.98% Lending Secured by 102% 2yr or less Treasuries held at Wells Fargo and/or IB" and, therefore, had a per share NAV of $105.74. MSS used this per share NAV to calculate the number of shares that Mosaic redeemed. Specifically, on November 18, 2020, the day after Mosaic's redemption, Milcinovic sent Mosaic a confirmation statement representing that—based on the November 17, 2020 per share NAV of $105.74—Mosaic's $2 million redemption was for 18,914.318 shares of GOVBX and that Mosaic continued to own 114,152.881 shares worth over $12 million. This materially misstated the value of each share of Mosaic's investment in GOVBX. But for MSS's misrepresentations regarding GOVBX's per share value, Accuvest would not have advised, and Mosaic would not have made or held, these investments in the Income Collecting Fund.

140.    MSS knew, or was reckless in failing to know, that the information provided by Abarbanel (which it repeated in its NAV Reports) was false and misleading. Specifically, MSS was either complicit or reckless in taking Abarbanel's word at face value about over $100 million in fund assets:

a.   having done no diligence on Abarbanel, his companies, or their directors;

b.   asking no questions regarding either the turnover of the Income Collecting Fund's auditor, from Richey May & Co. (2019) to, purportedly, Grant Thornton (2020), or regarding the Funds' use of multiple auditors at the same time for different share classes, (for example, in February 2019, the Income Collecting Fund used auditor Richey May & Co. for its "GOVBX" share class but used Berkower for State Funds, and, in August 2019, the Income Collecting Fund continued using Richey May & Co. for its "GOVBX" share class while using Bolko & Associates for its "GOVTX" share class);

c.   changing the custodian that held the securities lending agreements from a small company in Nevada (Alliance Trust) to a company in Israel that, upon information and belief, MSS did not know or verify (*i.e.*, K&L Trust), despite the fact that the Income Collecting Fund's custodian bank and custodian brokerage account were held by some of the most established financial institutions in the world, Wells Fargo and Interactive Brokers; and

d.   changing descriptions of the Income Collecting Fund's holdings to "on-demand line of credit" at year-end and then changing it back to "US Treasuries . . . Lending Secured by 102% 2yr or less Treasuries

or Cash held at Wells Fargo and/or IB" shortly after the new year,

based solely on Abarbanel's representations.

141.    In fact, MSS had access to, did in fact access, reviewed, and even periodically discussed with Abarbanel the Income Collecting Fund's accounts at Maybank, Wells Fargo, and Interactive Brokers.

142.    Milcinovic personally reviewed these custodian accounts on a daily basis and was doing the daily booking of the activity within the Fund.

143.    MSS was supposed to have performed a monthly reconciliation of its records of the Income Collecting Fund's holdings compared to the records of the Fund's custodians. But if that were true, then it would have known that its NAV Reports were false and misleading.

144.    MSS knew that the Fund never loaned any of the securities that it held.

145.    MSS knew or was reckless in failing to know that the Income Collecting Fund in fact did not have the secured loans that MSS reported directly to Accuvest and Mosaic in its daily NAV Reports.

146.    In particular, MSS was reckless in the way it accounted for the Income Collecting Fund's securities loans in its computer system. MSS would book reverse repurchase transactions based on their face value dollar amount.

147.    More specifically, from an accounting standpoint, MSS assigned the Income Collecting Fund's reverse repurchase agreements a "security type" in MSS's accounting system for money market fund investments, despite knowing that an unsecured loan to a related party is not comparable in risk profile or economic value to a cash-equivalent asset.

148.    In other words, upon information and belief, if Abarbanel reported to MSS a reverse repurchase transaction involving a $20 million *secured* loan, MSS would book a $20 million asset,

even if the accounts MSS regularly accessed and reviewed held *no collateral*. Thus, unsecured securities lending agreements would be booked as though they were secured; cash loans to related party shell companies would be booked as though they were collateralized loans to stable financial institutions. MSS simply buried its head in the sand and reported to Plaintiffs what Abarbanel said, not what the account statements showed.

149.   Upon information and belief, MSS failed to adequately reconcile the NAVs with statements or other trustworthy information from the custodian accounts purportedly holding secured securities lending agreements.

150.   One such custodian that purportedly held the Fund's secured securities lending agreements was Alliance Trust. Upon information and belief, MSS failed to conduct any reasonable diligence of the statements it received because, if it did, it would have noticed the very obvious red flags.

151.   For example, on February 27, 2020, Milcinovic asked the Income Collecting Fund: "Can you forward the January month end Alliance Trust statement, our rec team is asking for a copy."

152.   In response, the Income Collecting Fund (rather than Alliance Trust) sent to Milcinovic a two-page document named "GOVTX – Monthly Account Statement – 01.2020.pdf." The document had unverified information that appeared to be copied-and-pasted (and possibly edited) from two custodians—Alliance Trust and Interactive Brokers—for various accounts. The document appeared to relate to the Fund's "GOVTX" share class, rather than GOVBX (though the document seemingly represented some of the holdings of the GOVBX share class).

153.   The first part of the document purported to be an "Account Statement from 01/01/2020 to 01/31/2020" from Alliance Trust Company. It represented that, on January 31, 2020,

the Income Collecting Fund held an asset named "Securities Lending Agreement ('GOVBX')" issued by NALR. The rest of the document—which, unlike authentic account statements, was blurry and illegible—purported to be activity statements from Interactive Brokers for accounts held by NALR, IS, and Institutional Secured Credit, LLC.

154.    In short, the document that the Fund provided clearly was not an account statement issued by Alliance Trust or Interactive Broker. It lacked any indicia of reliability and should have been an obvious red flag for Milcinovic and MSS. Upon information and belief, instead of questioning the dubious information that the Income Collecting Fund presented or taking any steps to verify its accuracy, Milcinovic and MSS simply accepted it.

155.    The Income Collecting Fund subsequently changed the custodian that purportedly held the Fund's secured securities lending agreements from Alliance Trust to K&L Trust, an Israeli company.

156.    K&L Trust sent account statements for the Income Collecting Fund to MSS and Milcinovic. Its statements, like the ones from Alliance Trust, appear to have copied-and-pasted information from Interactive Brokers and, thus, should have raised obvious red flags that MSS and Milcinovic either intentionally ignored or recklessly failed to recognize.

157.    For example, on January 8, 2021, K&L Trust sent to MSS an "account statement" for December 2020. This "account statement" contained unverified information supposedly from Interactive Brokers, a screenshot of the definition of "UCC-1 financing statement" from Wikipedia, and reports that UCC Financing Statements had been filed with New Jersey for the secured lending transaction with IS and with Nevada for the secured lending transaction with NALR.

158.    If MSS had fulfilled its responsibilities of reconciling the "account statement" with the Income Collecting Fund's NAV by conducting reasonable diligence on the purported UCC Financing Statements, it would have learned that the transactions with the Counterparty Shells were not secured by cash or U.S. Treasuries, as required by the Income Collecting Fund's prospectuses. Instead, in violation of the Fund's prospectuses, the UCC Financing Statements indicate that the transactions were collateralized by the Counterparty Shells' assets and existing and future cash flows derived from those assets. Upon information and belief, MSS did nothing to verify the Counterparty Shells' assets and, thus, did not know the value of the Fund's secured lending transactions.

159.    As a result of MSS's failures to reconcile the NAV Reports against the securities lending agreements and associated collateral that formed the vast majority of the Fund's purported investments, all or nearly all of the NAV Reports made false representations regarding the Income Collecting Fund's holdings.

160.    For example, on May 27, 2021, MSS reported that the Income Collecting Fund's holding of "US Treasuries 2.45% Lending Secured by 102% 2yr or less Treasuries or Cash held at Wells Fargo and/or IB" was worth more than $25.98 million. This was false. Upon information and belief, the Income Collecting Fund neither owned sufficient US Treasuries to enter into such a securities lending agreement, nor did the Fund's brokerage account at Interactive Brokers or the Fund's bank account at Wells Fargo ever hold collateral associated with such a securities lending agreement.[44]

---

[44] *SEC v. Abarbanel*, 21-cv-5429(RA) (S.D.N.Y. June 22, 2021), ECF No. 14 Padgett Decl. ¶¶ 43, 47–49, and Exs. 6 & 8.

### iv. MSS's NAV Reports Recklessly Presented NAVs that Had No Basis in Any Legitimate Valuation Methodology

161.    At a minimum, MSS's report of the NAV of the Income Collecting Fund should have considered FASB valuation standards, which take into account credit quality, credit losses, economic conditions, collateral value, and the likelihood of collecting principal and interest payments.

162.    MSS's NAV Reports never reflected any independent assessment of the economic value of the Income Collecting Fund's holdings. Indeed, given that the holdings were unsecured, uncollateralized, or otherwise worthless loans to related parties, and MSS knew or was reckless in not knowing that the stated collateral was not in the Income Collecting Fund's Wells Fargo or Interactive Brokers accounts, any valuations of the securities lending agreements provided by Abarbanel were objectively incredible and absurd, and MSS knew or was reckless in not knowing it.

163.    The valuations in the NAV Reports were so manifestly erroneous, and MSS's representations were so highly unreasonable, that they represented an extreme departure from standards of ordinary care to the extent that the danger of securities fraud was either known to Defendants or so obvious that Defendants must have been aware of it.

164.    In the course of reviewing the Funds' prospectuses, and sending NAV reports directly to Mosaic, MSS never disclosed that its Fund Accounting Policies and Procedures, dated June 2017, told its personnel *to do nothing to independently evaluate the fund manager's representations of the value of illiquid assets, such as securities lending agreements, which are the main investment of the Funds.* Instead, MSS secretly implements the following policy and procedure:

*Policy*

The fund's Board of Trustees determines the value of an illiquid security based on the fund's Fair Valuation Procedures.

*Procedure*

When a security held by a fund is not readily valued by market quotations, its fair value is determined in good faith by the Board of Trustees. It is the expectation of MSS that the investment advisor notify the Board of Trustees of the illiquid security and that the advisor then inform MSS of said security's fair value based on the fund's respective policies. This practice continues throughout the period the security is held by the fund and remains illiquid and/or restricted.

165.    In other words, as between the Income Collecting Fund and MSS, valuation is a shell game: MSS publishes NAV Reports to Mosaic in its own name, using its proprietary software, and a dedicated email address; the Income Collecting Fund lures investors by touting MSS's role as independent fund accountant, administrator, and transfer agent who should be ensuring accurate books and records and accurate NAV Reports; and MSS points back at the Income Collecting Fund for the valuations, while knowing that the basis for the economic value—the collateral—is not what the Income Collecting Fund represents.

**v.    MSS Knew that the Income Collecting Fund Used Investor Funds for Unsecured and Uncollateralized Transactions, In Violation of the Terms of its Prospectuses**

166.    MSS knew or was reckless in not knowing that the Income Collecting Fund used investor funds in ways that were not permitted by its prospectuses.

167.    Upon information and belief, throughout 2019 and 2020, the Income Collecting Fund sent emails to MSS notifying it that, immediately after the Income Collecting Fund received investor funds, it wired those funds to the Counterparty Shells before the loan agreement governing the transaction had even been executed.

168.    For example, on September 4, 2020, Mosaic invested $14 million in the Income Collecting Fund and wired the funds. The Income Collecting Fund, upon receipt of Mosaic's investment, promptly wired the funds to NALR before the relevant loan agreement between the Income Collecting Fund and NALR had been executed. It sent an email to two MSS officers, stating:  "We received a subscription for $14,000.000 to GOVBX from Mosaic Financial (formerly Old Fort Financial) for today 09.04.20 . . . . The funds were received and loaned to counterparty North American Liquidity Resources. A lending agreement is out for signature which you will receive later today."

169.    Based on the Income Collecting Fund's email, MSS knew or was reckless in not knowing the Income Collecting Fund did not purchase any U.S. Treasury securities with the $14 million that Mosaic invested on September 4, 2020. Furthermore, MSS had access to and reviewed statements from Interactive Brokers. Thus, upon information and belief, MSS saw that the Income Collecting Fund purchased no U.S. Treasury securities in September 2020.

170.    Three days later, on September 7, 2020, Boisy Roberts—a director of the Income Collecting Fund—sent MSS a document named "Master Securities Loan Agreement" and dated September 4, 2020. This "Master Securities Loan Agreement" was executed between the Income Collecting Fund as "Lender" and NALR as "Borrower." This Master Securities Loan Agreement stated that it was "updated from September 1, 2020 to include new lending of $14MM," the amount of Mosaic's investment, and that the agreement pertained to "transactions in which one party . . . will lend to the other party . . . certain Securities . . . against a transfer or pledge or assignment of Collateral . . . ."  Annex A to the agreement described the "Securities being lent" as "$104,500,00 [sic] Face Value of US Treasuries . . . ."

171. MSS knew that the September 4, 2020 Master Securities Loan Agreement was false and fraudulent. Whereas it stated that $14 million of U.S. treasuries had been loaned to NALR, MSS knew—because the Income Collecting Fund told it—that "the funds" (*i.e.* cash, and not U.S. treasuries or other securities) had been loaned to NALR.

172. Upon information and belief, MSS never asked the Income Collecting Fund for any documentation or information to reconcile the contradictory information from the Income Collecting Fund's September 4, 2020 email and the "Master Securities Loan Agreement" it received on September 7, 2020.

173. Despite knowing that a material term of the agreement was false, on September 8, 2020, MSS issued a NAV Report to Accuvest that represented that the Income Collecting Fund held 104,500,000 "shares" of "US Treasuries 2.98% Lending Secured by 102% 2yr or less Treasuries held at Wells Fargo and/or IB" attributable to the ticker "NA" and that the "total cost" of the holding was $104.5 million. Thus, instead of accurately representing that the Income Collecting Fund loaned cash to NALR, which was not permitted by the Income Collecting Fund's prospectus, MSS fraudulently misrepresented to Mosaic that the Income Collecting Fund had entered into an *overcollateralized* securities lending transaction with collateral held at Wells Fargo or Interactive Brokers.

### vi. On a Handful of Occasions, the NAV Reports Described the Income Collecting Fund's Unsecured and Uncollateralized Cash Loans to Related Counterparties

174. In the NAV Report for December 28, 2020, MSS reported that the Income Collecting Fund held 102.5 million "shares" of "US Treasuries 2.98% Lending Secured by 102% 2yr or less Treasuries or Cash held at Wells Fargo and/or IB," which it attributed to the ticker "NA."

175.    However, in the NAV Report for December 29, 2020, the very next day, the description of this asset changed to "North American 2.98% on-demand line of credit."

176.    MSS provided no explanation for this description change.

177.    Despite completely changing the description of the holding, MSS represented in the December 29, 2020 NAV Report, in a sheet entitled "Current Holdings Day Change," that there had been no change to the holding.

178.    The Income Collecting Fund's prospectuses did not permit the Fund to issue "on-demand lines of credit."

179.    Upon information and belief, MSS changed the description of the asset based on its discussions with Abarbanel. On December 28, 2020, Milcinovic sent an email to the Income Collecting Fund, indicating that he saw that it "received $110,000,000 back from north American" but he "d[idn't] have any records of this[.]" The Income Collecting Fund replied: "[t]he 110M needs to be recorded as a redemption of loans associated with the following shares classes as of December 28, 2020: GOVBX [and] GOVAX[.] Today, the fund is resigning this lending agreement against as an allocation of an on-demand line of credit (similar to the on-demand lines of credit in the Shekel shareclasses) under the same lending rates which were previously made in the GOVBX and GOVAX  shareclasses[.]"

180.    Upon information and belief, MSS conducted no further diligence on this extremely important representation.

181.    MSS maintained the "North American 2.98% on-demand line of credit" description of the holding until January 7, 2021—thus suspiciously straddling year-end—when MSS replaced it with 144.5 million shares of "US Treasuries 2.95% Lending Secured by 102% 2yr or less

Treasuries or Cash held at Wells Fargo and/or IB," attributable to the ticker "NA-LC."  MSS failed to investigate this obvious red flag.

### vii.    Mosaic and Accuvest Were Harmed by MSS's False NAV Reports

182.    MSS, Milcinovic, and Anastasi consciously disregarded the danger that Mosaic and Accuvest would be misled by the NAV Reports, which materially mischaracterized the Income Collecting Fund's holdings and misstated its valuations.

183.    In reliance upon MSS's misrepresentations and omissions of material facts regarding the extremely low risk and extremely low volatility of the Income Collecting Fund's positions treasury holdings, Mosaic made 20 investments in the Income Collecting Fund, of a net total of over $106 million.

184.    Mosaic's investments are set forth below:

| Date | Investment Amount |
|---|---|
| 03/05/2019 | $20,500,000 |
| 03/15/2019 | $3,000,000 |
| 03/21/2019 | $8,000,000 |
| 05/10/2019 | $2,000,000 |
| 06/27/2019 | $16,000,000 |
| 08/07/2019 | $7,500,000 |
| 10/02/2019 | $2,500,000 |
| 01/02/2020 | $5,000,000 |
| 02/14/2020 | $3,500,000 |
| 03/13/2020 | $9,000,000 |
| 04/27/2020 | $5,000,000 |
| 05/22/2020 | $2,030,000 |
| 07/27/2020 | $2,000,000 |
| 08/11/2020 | $6,500,000 |
| 08/18/2020 | $7,500,000 |
| 09/04/2020 | $14,000,000 |
| 12/10/2020 | $20,000,000 |
| 01/06/2021 | $22,000,000 |
| 01/07/2021 | $25,000,000 |
| 02/18/2021 | $10,000,000 |
| **Total** | $106,530,000 |

185.    Of the 20 investments, 16 of them—a net total of about $72.5 million—were made after June 18, 2019, when MSS started sending Mosaic and/or Accuvest the NAV Reports.

186.    On a regular basis, and specifically before and in connection with each of those 16 investments, Mosaic and Accuvest reviewed and reposed trust and confidence in MSS's NAV Reports, specifically the statement of the Income Collecting Fund's holdings and their valuation.

**E.    The Income Collecting Fund and MSS Refused to Process Mosaic's Final Redemption Request and Return Mosaic's Money**

187.    As the Income Collecting Fund's transfer agent and administrator, MSS was responsible for receiving and processing Mosaic's redemption requests.

188.    Regarding investors' ability to redeem their investments in the Income Collecting Fund, the prospectuses represented that "shares are available for daily redemption," "[s]hares will be redeemable at the option of the Shareholder on any Business Day and at any amount," and a "redemption request must be received by the Administrator [*i.e.*, MSS] at least One (1) Business Day (or such lesser period as the Directors may generally or in any particular case permits) prior to the relevant Redemption Day."

189.    These representations by the Income Collecting Fund also turned out to be false and misleading when, beginning in May 2021, MSS—the transfer agent responsible for processing investment and redemption requests—refused to process Mosaic's request for a full redemption.

190.    Upon information and belief, in about February and March of 2021, after the SEC began investigating Abarbanel, Chilelli, and the Income Collecting Fund, the Income Collecting Fund forcibly redeemed all its investors except for Mosaic for full value, based on valuations that MSS provided, ensuring that all the Income Collecting Fund's losses would be borne by Mosaic.[45]

---

[45] Am. SEC Compl. ¶ 9.

191.    On or about May 21, 2021, after Mosaic and Accuvest learned of the SEC's investigation of Abarbanel and the Income Collecting Fund, Mosaic submitted to MSS and the Income Collecting Fund a request to redeem its remaining $106 million investment in the Income Collecting Fund.[46] This redemption request was in the same form and format as the redemptions that Mosaic successfully made on prior occasions.

192.    Instead of complying with the prospectuses' promises regarding the availability of daily redemptions, MSS and the Income Collecting Fund refused to honor Mosaic's request. Rather, the Income Collecting Fund and its counsel threw up obstacles to obstruct Mosaic's redemption request.

193.    On May 23, 2021, two days after Mosaic's redemption request, Abarbanel and the Income Collecting Fund stated that Mosaic's redemption request could not be fulfilled because Mosaic needed to undergo an "omnibus review process," which required the Income Collecting Fund to appoint a "Money Laundering Compliance Officer" and a "Money Laundering Reporting Officer."

194.    MSS received these pretextual excuses and knew, or was reckless in not knowing, that they were pretextual because MSS had previously processed Mosaic's redemption requests in the same forms, without any such purported review.

195.    On or about June 1, 2021, Fund attorney Lu informed Mosaic by email that, in order to obtain its redemption, it would need to sign a new agreement, referred to as "Annex B." Under Annex B, Abarbanel and the Income Collecting Fund proposed to satisfy Mosaic's redemption request by providing Mosaic with an unspecified amount of money held by IS and NALR, along

---

[46] Am. SEC Compl. ¶¶ 9, 10, 100 and 113.

with the "future cash flow" from the Income Collecting Fund's lending agreements with counterparties IS and NALR.

196.    MSS received this email and a copy of Annex B.

197.    Upon information and belief, the lending agreements referenced in Annex B were the agreements that State Funds previously entered into with IS and NALR, which were rolled over to the Income Collecting Fund after Abarbanel de-registered State Funds. The agreements were not the collateralized repurchase and reverse repurchase agreements described in the Income Collecting Fund's prospectuses.

198.    In a June 4, 2021 email, Lu told Mosaic that Annex B reflected a "redemption in kind" under the terms of the Income Collecting Fund's prospectus. This was false, as the prospectus defines "redemption in kind" as a "payment in whole or in part in readily marketable securities." The unsecured loan agreements between the Income Collecting Fund, on the one hand, and IS and NALR, on the other hand, described in Annex B were not "readily marketable securities," and therefore are not "redemptions in kind." MSS received this correspondence with Mosaic regarding Annex B and said nothing regarding the bogus redemption conditions.

199.    MSS was aware of the proper process for redemptions, as it had received and honored Mosaic's redemptions in the past. It knew, or was reckless in not knowing, that Annex B was not a "redemption in kind" under the terms of the Income Collecting Fund's prospectuses. Despite this, MSS continued to refuse to process Mosaic's redemption request and disclosed nothing to Mosaic regarding the full redemptions of every investor *except Mosaic*. MSS's refusal to do its job gave Abarbanel time to continue stealing Mosaic's money.

200.    Upon information and belief, on June 4, 2021, without providing any notice to Mosaic or Accuvest, Abarbanel and the Income Collecting Fund initiated a transfer of more than

$64 million out of the Income Collecting Fund's bank account and into its brokerage account, where Mosaic's funds were vulnerable to further unauthorized investment losses and to further misappropriation, depletion, and dissipation by Abarbanel and the Income Collecting Fund.[47]

201.    Upon information and belief, two weeks later, on June 17, 2021, again without any notice to Mosaic, Abarbanel caused and directed the Fund to transfer $10 million into a personal Vanguard account held by Robert Lu, the Income Collecting Fund's counsel and director.[48]

202.    On or about June 21, 2021, the SEC filed a complaint in the U.S. District Court for the Southern District of New York against Abarbanel, Chilelli, the Income Collecting Fund, and several other relief defendants who received funds as a result of the Income Collecting Fund's fraudulent scheme. In connection with the filing, the SEC requested and received a freeze on the assets of the defendants.

203.    On or about June 24, 2021, federal law enforcement arrested Abarbanel on charges of wire fraud and securities fraud, based on facts similar to those alleged in the SEC complaint.

204.    On January 31, 2022, the U.S. District Court for the Southern District of New York approved the settlement between the Income Collecting Fund and the SEC. In the Court's Final Judgment, it ordered the Income Collecting Fund to pay disgorgement in the amount of $106,530,000, plus prejudgment interest thereon in the amount of $5,061,312.19, of which $76,944,774.90 was to be distributed to Mosaic.

205.    On or about September 7, 2022, Abarbanel pleaded guilty to one count of Investment Advisor Fraud in the U.S. District Court for the Southern District of New York. On May 17, 2023, Abarbanel was sentenced to a period of incarceration of 48 months.

---

[47] Am. SEC Compl. ¶ 136.

[48] Am. SEC Compl. ¶ 138.

**Basis of Allegations Made Upon Information and Belief**

206.    Allegations made upon information and belief are based upon: the Amended Complaint filed by the U.S. Securities and Exchange Commission on January 27, 2022, which cites in support of its allegations the Declaration of Gregory C. Padgett, *SEC v. Abarbanel*, 21-cv-5429(RA) (S.D.N.Y. June 22, 2021), ECF No. 14, which itself is supported by 22 exhibits including prospectuses, account statements, emails, and agreements of the Income Collecting Fund; transcripts of the depositions of Defendants Gregory Getts and Steven Milcinovic taken by the Joint Official Liquidators of the Income Collecting Fund, on March 30, 2023; and emails and other documents from Accuvest, Mosaic, and MSS. Moreover, Plaintiffs submit that all allegations made upon information and belief and all allegations concerning matters peculiarly within Defendants' possession and control will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

## CLAIMS FOR RELIEF

### Count One
### Violation of Section 10(b) and Rule 10b-5 Against MSS
### (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5)

207.    Plaintiffs repeat and re-allege paragraphs 1 through 206 as if fully set forth herein.

208.    MSS knowingly prepared, caused to be prepared, and participated in the preparation of the NAV Reports that it issued directly to Mosaic and Accuvest.

209.    Such NAV Reports were materially false, misleading, and deceptive. Among other reasons alleged herein, the NAV Reports misrepresented the holdings of the Income Collecting Fund, as well as, *e.g.*, the value, custody, collateral, and change in position of the Income Collecting Fund's holdings.

210.    Moreover, such NAV Reports were materially false, misleading, and deceptive because, contrary to the prospectuses of the Income Collecting Fund, the counterparties of the

represented repurchase agreements and/or reverse repurchase agreements were related to Abarbanel.

211. MSS knew or was reckless in not knowing that the NAV Reports were materially false, misleading, and deceptive. Among other reasons alleged herein, Defendants knew that the NAV Reports they prepared and sent directly to Mosaic and Accuvest were not supported by the statements of two of the Income Collecting Fund's custodians, Wells Fargo and Interactive Brokers (which showed no collateral), and MSS was reckless in failing to ascertain adequately the holdings of the third custodian that purportedly held the vast majority of the Income Collecting Fund's assets.

212. For the reasons alleged herein, at a minimum, MSS acted in a highly unreasonable manner that represented an extreme departure from standards of ordinary care to the extent that the danger of fraudulently inducing Mosaic to invest and hold investments in the Fund to its detriment was either known to MSS or so obvious that MSS must have been aware of it.

213. For the reasons alleged herein, at a minimum, MSS was willfully blind and recklessly indifferent to the red flags alleged above.

214. Mosaic and Accuvest relied on MSS's NAV Reports to invest, hold their investments, and continue investing in the Income Collecting Fund. Between approximately March 5, 2019 through February 18, 2021, Mosaic made 20 investments in the Income Collecting Fund. The net total of these investments—after occasional redemptions—exceeded $106 million. Of the 20 investments, 16 of them—a net total of about $72.5 million—were made after June 18, 2019, when MSS started sending Mosaic and/or Accuvest the NAV Reports.

215.    MSS engaged in the aforementioned fraudulent conduct in connection with the purchase or sale of U.S. Treasury and other securities by the Income Collecting Fund, the Counterparty Shells, and the Trading Shells.

216.    In ignorance of the false and misleading nature of the material statements described above, and of the deceptive and manipulative devices and contrivances employed by Defendants, Mosaic and Accuvest relied, to their detriment, on such misleading statements and omissions in investing in the Income Collecting Fund.

217.    Plaintiffs would not have made and would have sought to rescind the entirety of Mosaic's investments—including, but not limited to, those made between June 18, 2019, and February 18, 2021—had MSS accurately disclosed the true and accurate state of the Funds' holdings, investment strategy and practices, and securities lending agreements.

218.    The misconduct of MSS directly and proximately caused Mosaic and Accuvest to suffer substantial loss of investment capital, lost profits, lost fees, and the expense of chasing down the money stolen through this fraudulent scheme.

219.    Specifically, Mosaic has lost approximately $23.4 million in principal, approximately $5 million of gains and accrued interest reported in MSS's NAV Reports, approximately $1 million in advisory fees, and over $1 million in legal fees.

220.    In addition, Accuvest has lost over $570,000 in advisory fees due to the Income Collecting Fund's and Defendants' fraud and over $40,000 in legal fees.

221.    By reason of the foregoing, MSS directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made,

not misleading; or (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Accuvest and Mosaic in connection with its investments in the Fund.

## Count Two
## Fraudulent Misrepresentation Against MSS and Milcinovic (Purchaser Claims)[49]

222.    Plaintiffs repeat and re-allege paragraphs 1 through 221 as if fully set forth herein.

223.    In hundreds of NAV Reports over two years, MSS and Milcinovic represented to Mosaic and Accuvest, in connection with Mosaic's investment in the Income Collecting Fund, that its holdings included tens and hundreds of millions of dollars of "US Treasuries . . . Lending Secured by 102% 2yr or less Treasuries or Cash held at Wells Fargo and/or IB."

224.    These representations were false and misleading because: (i) the Income Collecting Fund did not invest its net assets primarily in U.S. Treasury securities; (ii) the Income Collecting Fund did not, in fact, hold the assets represented; (iii) the counterparties of the represented repurchase agreements and/or reverse repurchase agreements with the Income Collecting Fund were related to Abarbanel; and (iv) the counterparties did not provide the represented collateral in exchange for the Income Collecting Fund's assets.

225.    MSS's and Milcinovic's representations regarding the Income Collecting Fund's holdings were material to Mosaic's decision to make investments in the Income Collecting Fund.

226.    MSS's and Milcinovic's representations regarding the Income Collecting Fund's holdings were material to Accuvest's decision to advise Mosaic to make investments in the Income Collecting Fund.

---

[49] Plaintiffs contend and allege that the laws of Ohio govern their common law claims. However, even if the common law claims are held to arise under the law of a different jurisdiction (such as New York, Utah, or the Bahamas), Plaintiffs believe the elements of such claims are substantially similar across relevant jurisdictions and that Plaintiffs' allegations satisfy the relevant elements.

227.    MSS and Milcinovic made these false and misleading representations and omissions knowingly, or with such utter disregard as to whether they were true or false, that MSS's knowledge may be inferred because, among other reasons alleged herein, they:  (i) had direct access to some or all of the Income Collecting Fund's bank and brokerage accounts; (ii) knew that the Income Collecting Fund did not receive the represented collateral for its loaning of cash; and (iii) knew that occasionally cash was lent to a counterparty before the relevant loan agreement had been executed.

228.    MSS and Milcinovic made these false and misleading representations with the intent to induce Mosaic and Accuvest to rely upon them by making investments in the Income Collecting Fund.

229.    Mosaic and Accuvest justifiably relied upon the false representations made by MSS and Milcinovic.

230.    As a direct and proximate result of their reliance upon MSS's and Milcinovic's false representations, Plaintiffs suffered damages. Specifically, Mosaic has lost approximately $23.4 million in principal, approximately $5 million of gains and accrued interest reported in MSS's NAV Reports, approximately $1 million in advisory fees, and over $1 million in legal fees. In addition, Accuvest has lost over $570,000 in advisory fees due to the Income Collecting Fund's and MSS's fraud and over $40,000 in legal fees.

### Count Three
### Fraudulent Misrepresentation Against MSS and Milcinovic (Holder Claims)

231.    Plaintiffs repeat and re-allege paragraphs 1 through 230 as if fully set forth herein.

232.    MSS and Milcinovic induced Mosaic and Accuvest to hold Mosaic's positions in the Income Collecting Fund by representing to Mosaic and Accuvest, in hundreds of NAV Reports over two years, in connection with Mosaic's investment in the Income Collecting Fund, that the

Income Collecting Fund's holdings included tens and hundreds of millions of dollars of "US Treasuries . . . Lending Secured by 102% 2yr or less Treasuries or Cash held at Wells Fargo and/or IB."

233.    These representations were false and misleading because, among other reasons alleged herein: (i) the Income Collecting Fund did not invest its net assets primarily in U.S. Treasury securities; (ii) the Income Collecting Fund did not, in fact, hold the assets represented; (iii) the counterparties of the represented repurchase agreements and/or reverse repurchase agreements that Income Collecting Fund entered into were related to Abarbanel; and (iv) the counterparties did not provide the represented collateral in exchange for the Income Collecting Fund's assets.

234.    MSS's and Milcinovic's representations regarding the Income Collecting Fund's holdings were material to Mosaic's decision to hold its investments in the Income Collecting Fund.

235.    MSS's and Milcinovic's representations regarding the Income Collecting Fund's holdings were material to Accuvest's decision to advise Mosaic to hold its investments in the Income Collecting Fund.

236.    MSS and Milcinovic made these false and misleading representations and omissions knowingly or with such utter disregard as to whether they were true or false that MSS's knowledge may be inferred because, among other reasons alleged herein, they: (i) had direct access to some or all of the Income Collecting Fund's bank and brokerage accounts; (ii) knew that the Income Collecting Fund did not receive the represented collateral for its loaning of cash; and (iii) knew that occasionally cash was lent to a counterparty before the relevant loan agreement had been executed.

237.    MSS and Milcinovic made these false and misleading representations with the intent to induce Mosaic and Accuvest to rely upon them by holding their investments in the Income Collecting Fund.

238.    Mosaic and Accuvest justifiably relied upon the false representations made by MSS and Milcinovic.

239.    Plaintiffs would have sought to rescind the entirety of Mosaic's investments— including, but not limited to, those made between June 18, 2019, and February 18, 2021—had MSS and Milcinovic accurately disclosed the true and accurate state of the Funds' holdings, investment strategy and practices, and securities lending agreements.

240.    Furthermore, Plaintiffs would have sought to rescind Mosaic's investments— including, but not limited to, those made between June 18, 2019, and February 18, 2021—had MSS and Milcinovic accurately disclosed the true and accurate state of MSS's fund administration, fund accounting, and transfer agent services.

241.    As a direct and proximate result of their reliance upon MSS's and Milcinovic's false representations, Plaintiffs suffered damages. Specifically, Mosaic has lost approximately $23.4 million in principal, approximately $5 million of gains and accrued interest reported in MSS's NAV Reports, approximately $1 million in advisory fees, and over $1 million in legal fees. In addition, Accuvest has lost over $570,000 in advisory fees due to the Income Collecting Fund's and MSS's fraud and over $40,000 in legal fees.

## Count Four
### Negligent Misrepresentation Against All Defendants (Purchaser Claims)

242.    Plaintiffs repeat and re-allege paragraphs 1 through 241 as if fully set forth herein.

243.    MSS, Anastasi, and Milcinovic in the course of their business and/or employment, supplied the false and misleading NAV Reports to Mosaic and Accuvest to guide their investment

in, and redemptions from, the Income Collecting Fund. Specifically, in hundreds of NAV Reports over two years, MSS, Anastasi, and Milcinovic falsely represented to Mosaic and Accuvest in connection with Mosaic's investment in the Income Collecting Fund that the Income Collecting Fund owned tens or hundreds of millions of "US Treasuries . . . Lending Secured by 102% 2yr or less Treasuries or Cash held at Wells Fargo and/or IB."

244.    These representations were false and misleading because:  (i) the Income Collecting Fund did not invest its net assets primarily in U.S. Treasury securities; (ii) the Income Collecting Fund did not, in fact, hold the assets represented; (iii) the counterparties of the represented repurchase agreements and/or reverse repurchase agreements that Income Collecting Fund entered into were related to Abarbanel; and (iv) the counterparties did not provide the represented collateral in exchange for the Income Collecting Fund's assets.

245.    MSS, Anastasi, and Milcinovic made the false representations and material omissions knowing that Mosaic and Accuvest would use and rely upon the representations and omissions for the particular purpose of determining where and how to invest its assets and, in particular, to decide to invest its assets in the Income Collecting Fund.

246.    Mosaic and Accuvest justifiably relied upon the false information that MSS and Milcinovic provided when Mosaic invested in the Income Collecting Fund and when Accuvest advised Mosaic to invest in the Income Collecting Fund.

247.    MSS, Anastasi, and Milcinovic had a duty not to negligently supply false information about the Income Collecting Fund's holdings in NAV Reports to Accuvest and Mosaic.

248.    MSS, Anastasi, and Milcinovic failed to exercise reasonable care or competence both in obtaining and in communicating the information about the Income Collecting Fund's

holdings and their valuation contained in the NAV Reports to Mosaic and Accuvest. More specifically, they did not take reasonable steps, consistent with the standard of care for fund administrators, to confirm the accuracy of their representations regarding the Income Collecting Fund's holdings or to investigate the red flags of which they were aware.

249.    MSS was under Getts' ownership, oversight, and control at all relevant times.

250.    Moreover, MSS delegated to Getts, as Chief Compliance Officer, the duty to ensure that affirmative representations made by MSS as fund administrator and transfer agent were true and not misleading.

251.    Getts breached that duty through the acts and omissions alleged above.

252.    MSS's, Getts', Anastasi's, and Milcinovic's actions alleged herein were the direct and proximate cause of Mosaic's and Accuvest's losses.

253.    As a result of Mosaic's and Accuvest's reasonable reliance upon the negligent misrepresentations of MSS, Anastasi, and Milcinovic—for which Getts was responsible—Plaintiffs have suffered pecuniary loss. Specifically, Mosaic has lost approximately $23.4 million in principal, approximately $5 million of gains and accrued interest reported in MSS's NAV Reports, approximately $1 million in advisory fees, and over $1 million in legal fees. In addition, Accuvest has lost over $570,000 in advisory fees due to the Income Collecting Fund's and MSS's negligent misrepresentation and over $40,000 in legal fees.

### Count Five
### Negligent Misrepresentation Against All Defendants (Holder Claims)

254.    Plaintiffs repeat and re-allege paragraphs 1 through 253 as if fully set forth herein.

255.    MSS, Anastasi, and Milcinovic induced Mosaic and Accuvest to hold Mosaic's positions in the Income Collecting Fund by, in the course of their business and/or employment, supplying the false and misleading NAV Reports to Mosaic and Accuvest to guide Mosaic's

holding (and not redeeming) its investment in the Income Collecting Fund. Specifically, in hundreds of NAV Reports over two years, MSS, Anastasi, and Milcinovic falsely represented to Mosaic and Accuvest, in connection with Mosaic's investment in the Income Collecting Fund, that the Income Collecting Fund owned tens or hundreds of millions of "US Treasuries . . . Lending Secured by 102% 2yr or less Treasuries or Cash held at Wells Fargo and/or IB."

256.     These representations were false and misleading because:  (i) the Income Collecting Fund did not invest its net assets primarily in U.S. Treasury securities; (ii) the Income Collecting Fund did not, in fact, hold the assets represented; (iii) the counterparties of the represented repurchase agreements and/or reverse repurchase agreements that Income Collecting Fund entered into were related to Abarbanel; and (iv) the counterparties did not provide the represented collateral in exchange for the Income Collecting Fund's assets.

257.     MSS, Anastasi, and Milcinovic made the false representations and material omissions knowing that Mosaic and Accuvest would use and rely upon the representations and omissions for the particular purpose of determining where and how to invest its assets and, in particular, to decide to hold its investments in the Income Collecting Fund.

258.     Mosaic and Accuvest justifiably relied upon the false information that MSS and Milcinovic provided when Mosaic held its investment in the Income Collecting Fund.

259.     Plaintiffs would have sought to rescind the entirety of Mosaic's investments—including, but not limited to, those made between June 18, 2019, and February 18, 2021—had Defendants accurately disclosed the true and accurate state of the Funds' holdings, investment strategy and practices, and securities lending agreements.

260.    MSS, Anastasi, and Milcinovic had a duty not to negligently supply false information about the Income Collecting Fund's holdings in NAV Reports to Accuvest and Mosaic.

261.    MSS, Anastasi, and Milcinovic failed to exercise reasonable care or competence both in obtaining and in communicating the information about the Income Collecting Fund's holdings and their valuation contained in the NAV Reports to Mosaic and Accuvest. More specifically, they did not take reasonable steps, consistent with the standard of care for fund administrators, to confirm the accuracy of their representations regarding the Income Collecting Fund's holdings or to investigate the red flags of which they were aware.

262.    MSS was under Getts' ownership, oversight, and control at all relevant times.

263.    Moreover, MSS delegated to Getts, as Chief Compliance Officer, the duty to ensure that affirmative representations made by MSS as fund administrator and transfer agent were true and not misleading.

264.    Getts breached that duty through the acts and omissions alleged above.

265.    MSS's, Getts', Anastasi's, and Milcinovic's actions were the direct and proximate cause of Mosaic's and Accuvest's losses.

266.    As a result of Mosaic's and Accuvest's reasonable reliance upon the negligent misrepresentations of MSS, Anastasi, and Milcinovic—for which Getts was responsible—Plaintiffs have suffered pecuniary damages. Specifically, Mosaic has lost approximately $23.4 million in principal, approximately $5 million of gains and accrued interest reported in MSS's NAV Reports, approximately $1 million in advisory fees, and over $1 million in legal fees. In addition, Accuvest has lost over $570,000 in advisory fees due to the Income Collecting Fund's and MSS's negligent misrepresentation and over $40,000 in legal fees.

**Count Six**
**Breach of Fiduciary Duty Against MSS**

267.    Plaintiffs repeat and re-allege paragraphs 1 through 266 as if fully set forth herein.

268.    MSS was responsible for calculating the NAV Reports of the Income Collecting Fund.

269.    MSS knew that the intended and actual recipients and beneficiaries of the NAV Reports were, or included, investors such Mosaic and/or its advisor Accuvest.

270.    MSS owed Mosaic and Accuvest a fiduciary duty. By virtue of MSS's professional roles as fund administrator and transfer agent, Accuvest and Mosaic had, and were induced by MSS and the Income Collecting Fund to have, special trust and confidence in MSS's integrity and fidelity, which gave rise to MSS's superior position vis-à-vis Accuvest and Mosaic. Accordingly, MSS was under a duty to act for or to give advice for the benefit of Plaintiffs regarding Mosaic's investment in the Income Collecting Fund.

271.    More specifically, MSS, as the Income Collecting Fund's administrator and transfer agent, had a duty to Mosaic and Accuvest to:  (i) confirm that there was a reasonable basis for the asset valuations reflected in the NAV Reports; (ii) confirm that the stated holdings were in fact held by the custodian institutions; (iii) confirm, in particular, that securities lending agreements represented as "secured" were, in fact, secured and that the stated collateral was, in fact, held as collateral; (iv) conduct reasonable due diligence on Abarbanel, the custodian institutions, and the securities lending counterparties; (v) investigate the red flags alleged herein; and (vi), in a timely manner, to correct false information and notify Accuvest and Mosaic regarding information inconsistent with MSS's prior NAV Reports.

272.    Upon information and belief, MSS understood that Accuvest and Mosaic put special trust and confidence in MSS as the entity responsible for calculating and reporting the NAV of the Income Collecting Fund.

273.    MSS was at least negligent in failing to observe the foregoing duties that it owed to Mosaic and Accuvest.

274.    MSS, as Milcinovic's and Anastasi's employer and/or principal, and as the party that provided the services of Milcinovic to the Income Collecting Fund, Mosaic, and/or Accuvest, is liable for its employees' and/or agents' conduct.

275.    The breaches of fiduciary duty committed by MSS proximately caused damages to Mosaic and Accuvest. Specifically, Mosaic has lost approximately $23.4 million in principal, approximately $5 million of gains and accrued interest reported in MSS's NAV Reports, approximately $1 million in advisory fees, and over $1 million in legal fees. In addition, Accuvest has lost over $570,000 in advisory fees due to the Income Collecting Fund's and MSS's fraud and over $40,000 in legal fees.

<u>**Count Seven**</u>
<u>**Ohio Securities Fraud Against MSS and Milcinovic**</u>
<u>**(Ohio Rev. Code Ann. §§ 1707.43(A) and 1707.44(J))**</u>

276.    Plaintiffs repeat and re-allege paragraphs 1 through 275 as if fully set forth herein.

277.    In violation of Ohio Rev. Code Ann. § 1707.44(J), Abarbanel and the Income Collecting Fund, with the purpose to deceive, made, issued, and published statements in the Income Collecting Fund's prospectuses affecting its value, which they knew were false. Specifically, they stated that the Income Collecting Fund: (i) "invests its net assets primarily (exclusive of collateral with respect to securities lending and reverse repurchase agreement transactions) in U.S. Treasury securities, which include bills, notes, and bonds issued by the U.S. Treasury, that have remaining maturities of greater than or equal to one month and less than three

months"; (ii) "[i]n order to enhance income, the [Income Collecting] Fund intends to enter into securities lending, repurchase agreement and/or reverse repurchase agreement transactions that provide the [Income Collecting] Fund with income at either fixed or floating (variable) interest rates and fees"; (iii) "[r]everse repurchase transactions involve the sale of securities with an agreement to repurchase the securities at an agreed upon price, date and interest payment in which proceeds (collateral) secured to the Fund with respect to reverse repurchase agreements will include either: (1) 100% units of mutual fund symbols: STATX or of this Fund or (2) 102%-115% U.S. Treasury securities"; and (iv) that the counterparties of such repurchase and reverse repurchase agreements would be "broker/dealers, institutional investors, institutional investment manager(s), banks, mutual funds, and insurance and/or reinsurance companies located in one of the member countries of the OECD."[50]

278.    Upon information and belief, Abarbanel and the Income Collecting Fund made these false statements in connection with the sale of certain shares of the Income Collecting Fund, U.S. Treasury securities, and/or other securities.

279.    MSS and Milcinovic participated in and/or aided Abarbanel and the Income Collecting Fund in their sale of certain shares of the Income Collecting Fund. Among other things, they received and processed investments and redemption requests and issued NAV Reports that falsely represented the holdings of the Income Collecting Fund and hid the fact that the Income Collecting Fund's transactions were in violation of its prospectuses.

280.    MSS and Milcinovic, in the course of their business and/or employment, supplied the false and misleading NAV Reports to Mosaic and Accuvest to guide their investment in, and redemptions from, the Income Collecting Fund. Specifically, in hundreds of NAV Reports over

---

[50] *See, e.g.,* January 2019 Income Collecting Fund Prospectus.

two years, MSS and Milcinovic falsely represented to Mosaic and Accuvest, in connection with Mosaic's investment in the Income Collecting Fund, that the Income Collecting Fund owned tens or hundreds of millions of "US Treasuries . . . Lending Secured by 102% 2yr or less Treasuries or Cash held at Wells Fargo and/or IB."

281. These representations were false and misleading because: (i) the Income Collecting Fund did not invest its net assets primarily in U.S. Treasury securities; (ii) the Income Collecting Fund did not, in fact, hold the assets represented; (iii) the counterparties of the represented repurchase agreements and/or reverse repurchase agreements that Income Collecting Fund entered into were related to Abarbanel; and (iv) the counterparties did not provide any collateral in exchange for the Income Collecting Fund's assets.

282. MSS knew or was reckless in not knowing that the NAV Reports were materially false, misleading, and deceptive. Among other reasons alleged above, MSS and Milcinovic knew that the NAV Reports they prepared and sent directly to Mosaic and Accuvest were not supported by the statements of two of the Income Collecting Fund's custodians, Wells Fargo and Interactive Brokers (which showed no collateral), and MSS was reckless in failing to ascertain adequately the holdings of the third custodian that purportedly held the vast majority of the Income Collecting Fund's assets.

283. MSS's knowledge may also be inferred because, among other reasons above herein, they: (i) had direct access to some or all of the Income Collecting Fund's bank and brokerage accounts; (ii) knew that the Income Collecting Fund did not receive the represented collateral for its cash loans; and (iii) knew that occasionally cash was lent to a counterparty before the relevant loan agreement had been executed.

284.    Relying upon the NAV Reports that MSS and Milcinovic issued, Mosaic invested about $72.5 million in the Income Collecting Fund, of which approximately $23.4 million has not been returned to Mosaic.

285.    MSS's and Milcinovic's actions were the direct and proximate cause of Mosaic's loss of approximately $23.4 million.

286.    Under Ohio Rev. Code Ann. § 1707.43(A), "every person that has participated in or aided the seller [of securities] in any way in making such sale or contract for sale[] are jointly and severally liable to the purchaser . . . for the full amount paid by the purchaser and for all taxable court costs[.]"

287.    Accordingly, MSS and Milcinovic are jointly and severally liable to Mosaic for approximately $23.4 million, the unreturned amount that Mosaic paid for its investment in the Income Collecting Fund, and all taxable court costs.

**Count Eight**
**Violation of Utah Uniform Securities Act Against MSS**
**(Utah Code § 61-1-1 and -22)**

288.    Plaintiffs repeat and re-allege paragraphs 1 through 287 as if fully set forth herein.

289.    By virtue of sending false and fraudulent NAV Reports to Mosaic and Accuvest, in connection with Mosaic's investments in the Income Collecting Fund, which are "securities" under Utah law, MSS directly or indirectly: (i) employed a device, scheme or artifice to defraud; (ii) made untrue statements of material fact; and/or (iii) engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit upon Mosaic and Accuvest, in connection with the offer, sale, or purchase of a security.

290.    Moreover, by disseminating materially false and misleading NAV Reports on behalf of the Income Collecting Fund to Mosaic and Accuvest, MSS acted as the Income

Collecting Fund's agent and materially aided the Income Collecting Fund's fraud in connection with the offer, sale, or purchase of a security.

291.    Therefore, MSS is jointly and severally liable for losses sustained by Mosaic and Accuvest to the same extent as the Income Collecting Fund.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that the Court enter judgment and relief as follows:

a.    Awarding damages to Plaintiffs, in an amount to be determined by trial and to otherwise make Plaintiffs whole for any and all losses as a result of the Defendants' actions;

b.    Awarding Plaintiffs punitive damages in an amount to be determined at trial;

c.    Awarding Plaintiffs attorney's fees, costs, and expenses incurred in the prosecution of this action; and

d.    Awarding Plaintiffs such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' actions.

Dated: October 20, 2023                    Respectfully submitted,

                                           **FLANNERY GEORGALIS, LLC**

                                 By:    */s/ Paul M. Flannery*
                                        Paul M. Flannery (OH: 0091480)
                                        Patrick M. Rahill (OH: 0093556)
                                        1375 E. 9th Street, 30th Floor
                                        Cleveland, OH 44114
                                        Tel: (216) 367-2094 (Paul)
                                        Tel: (216) 306-3077 (Patrick)
                                        paul@flannerygeorgalis.com
                                        prahill@flannerygeorgalis.com

                                        W. Benjamin Reese (OH: 0096108)
                                        175 South Third Street, Suite 1060
                                        Columbus, OH 43215
                                        Tel: (216) 230-9041
                                        breese@flannerygeorgalis.com


                                           **WALDEN MACHT & HARAN LLP**

                                 By:    */s/ Derek A. Cohen*
                                        Derek A. Cohen (NY: 2822807)
                                        Brian D. Mogck (NY: 4509832)
                                        *Pro hac vice applications to be filed*
                                        250 Vesey Street, 27th Floor
                                        New York, NY 10281
                                        Tel: (212) 335-2030
                                        derek.cohen@wmhlaw.com
                                        bmogck@wmhlaw.com

                                        *Attorneys for Plaintiffs*


                              **<u>JURY DEMAND</u>**

Plaintiffs demand that all triable claims and issues be tried to a jury as provided for in

Federal Rule of Civil Procedure 38.

                                        */s/ Paul M. Flannery*
                                        Paul M. Flannery