# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MOSAIC FINANCIAL LTD., *et al.*, | ) | Case No. 1:23-cv-2064 |
| | ) | |
| Plaintiffs, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Jennifer Dowdell Armstrong |
| MUTUAL SHAREHOLDER | ) | |
| SERVICES, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

In this securities fraud action, Plaintiffs allege that Defendant Mutual Shareholder Services and its employees provided false and misleading information about the value and holdings of an investment fund.  Plaintiffs allege that they relied on this information to make investment decisions and, after the fund collapsed due to a third party's fraud, they were unable to recover a substantial portion of their investments.  Plaintiffs claim that Defendants violated federal and State securities laws and assert various other State-law causes of action.  Defendants move to dismiss every count of the complaint.  Plaintiffs oppose and request leave to amend the complaint if the Court deems any allegations deficient.  For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion to dismiss and **DENIES** Plaintiffs leave to amend their complaint.

## STATEMENT OF THE FACTS

Taking the facts alleged in the complaint as true and construing them in Plaintiffs' favor, as the Court must on the motion before it, Plaintiffs base their claims on the following facts.

### A.  Parties

Plaintiff Mosaic Financial Ltd. and its predecessor, Old Fort Financial Ltd., is a registered broker-dealer with its principal place of business in the Bahamas.  (ECF No. 1, ¶ 44, PageID #14.)  Between 2017 and 2021, Mosaic Financial made a series of investments in two different but related investment funds:  (1) the State Funds–Enhanced Ultra-Short Duration Mutual Fund, which was registered in the United States; and (2) the Income Collecting Fund, which was registered in the Cayman Islands and represented that it would invest in U.S. Treasury securities with one to three months to maturity.  (*Id.*, ¶¶ 4, 13, 56, 62, 74 & 92, PageID #3, 6, 16, 17, 20 & 24.)  Plaintiff Accuvest Global Advisors, Inc. is an investment advisory firm incorporated in Utah where it also has its principal place of business.  (*Id.*, ¶ 45, PageID #14.)  Mosaic Financial retained Accuvest in 2019 for advice on its investments in the two funds at issue.  (*Id.*, ¶¶ 44–45.)

Defendant Mutual Shareholder Services is a transfer agent registered with the Securities and Exchange Commission, formed in Delaware with its principal place of business in Ohio.  (*Id.*, ¶ 46, PageID #14.)  Under federal law, a transfer agent means any person "who engages on behalf of an issuer of securities or on behalf of itself as an issuer of securities" in countersigning securities upon issuance, monitoring issuance of securities, registering the transfer of securities, and transferring

ownership of securities.  15 U.S.C. § 78c(a)(25).  Mutual Shareholder Services provides "financial reporting, fund accounting, fund administration, reporting and control, shareholder servicing, and transfer agency services to small and medium sized investment funds." (ECF No. 1, ¶ 46, PageID #14.)  From 2017 to 2021, Mutual Shareholder Services acted as the "fund administrator, fund accountant, and transfer agent" for the State Fund and the Income Collecting Fund.  (*Id.*, ¶ 47, PageID #15.) Federal regulations define a fund "administrator" as "any person who provides significant administrative or business affairs management services to an investment company."  17 C.F.R. § 270.0-1(a)(5).

Defendant Gregory Getts is the owner and chief compliance officer of Mutual Shareholder Services, who is "responsible for ensuring that MSS and its employees performed their responsibilities" in compliance with State and federal security laws. (ECF No. 1, ¶ 49, PageID #15.)  Defendant Bob Anastasi is a vice president of Mutual Shareholder Services and was involved in calculating the "trial balance" of the Income Collecting Fund.  (*Id.*, ¶ 50.)  Defendant Steven Milcinovic, a mutual fund administrator at Mutual Shareholder Services, was Plaintiffs' primary contact person.  (*Id.*, ¶ 51, PageID #15–16.)

### B.    Mosaic Financial's Investment in the Income Collecting Fund

Ofer Abarbanel, who is not a party to this litigation, established and controlled the investment funds.  (*Id.*, ¶ 4, PageID #3.)  After winding down the State Fund to avoid scrutiny after inquiries from other investors, Abarbanel established the Income Collecting Fund in February 2019.  (*Id.*, ¶¶ 79–80, PageID #21.)  Abarbanel "forced

Mosaic to redeem its shares" of the State Fund and encouraged it to reinvest in the Income Collecting Fund.  (*Id.*, ¶ 80.)

Abarbanel created several prospectuses for the Income Collecting Fund, which described the investment strategy as "primarily [investing] in U.S. Treasury securities, which include bills, notes, and bonds issued by the U.S. Treasury, that have remaining maturities of greater than or equal to one month and less than three months."  (*Id.*, ¶ 85, PageID #22.)  Mosaic Financial reviewed the prospectuses and fact sheets that Abarbanel provided and decided to invest, in part, based on the representations made in those documents.  (*Id.*, ¶¶ 90 & 92–93, PageID #23–24.)

### C.  Net Asset Value Reports

According to the complaint, Mosaic Financial also relied on the representations of Mutual Shareholder Services about the Income Collecting Fund's holdings and performance.  (*Id.*, ¶ 92, PageID #24.)  From June 18, 2019 through June 1, 2021, Mutual Shareholder Services made these representations in daily reports on the fund's net asset value, known NAV reports.  (*Id.*, ¶¶ 21 & 214, PageID #8 & #52.)  Between March 5, 2019 and February 18, 2021, Mosaic Financial made 20 investments totaling over $100 million in the Income Collecting Fund's GOVBX share class.  (*Id.*, ¶¶ 92 & 214, PageID #24 & 52.)  Mosaic Financial was the sole investor in that share class. (*Id.*, ¶ 21, PageID #8.)

"The Income Collecting Fund held MSS out as an independent and trustworthy administrator" and regulated transfer agent.  (*Id.*, ¶ 104, PageID #26; *see also id.* ¶ 26, PageID #9–10.)  According to the prospectuses, Mutual Shareholder Services had several responsibilities including:  providing accounting services and financial

4

reporting, making office space and personnel available to provide those services, and providing individuals to serve on a board. (*Id.*, ¶ 104, PageID #26–27.) It "possessed, reviewed, and commented on the Income Collecting Fund's prospectuses and was aware of the representations within them." (*Id.*, ¶ 108, PageID #27.) Among other things, Mutual Shareholder Services was required to calculate the net asset value per share of the fund, maintain records, and prepare financial reports. (*Id.*, ¶¶ 110–11, PageID #28–30.) Mutual Shareholder Services represented to its clients that its operations satisfied federal securities laws. (*Id.*, ¶ 113, PageID #30.) Overall, Mutual Shareholder Services was "supposed to play a vital role in ensuring" that the Income Collecting Fund operated consistently with the prospectuses. (*Id.*, ¶ 26, PageID #9–10.) The fund paid Mutual Shareholder Services at least $4,800 monthly in accounting and transfer agent fees. (*Id.*, ¶ 48, PageID #15.)

Of particular relevance to this dispute, Mutual Shareholder Services, and specifically Mr. Anastasi and Mr. Milcinovic, created daily net asset value reports using proprietary software that detailed the "holdings, . . . value, custody, collateral, and change in position" of the Income Collecting Fund's GOVBX share class. (*Id.*, ¶ 209, PageID #51; *id.*, ¶ 129, PageID #33; *see also id.*, ¶¶ 50–51, PageID #15.) These reports, sent from an email address at Mutual Shareholder Services, represented that the Income Collecting Fund's assets were held in specific U.S. Treasuries or in cash at specific banks. (*Id.*, ¶¶ 22 & 23, PageID #8–9.) Both Mosaic Financial and Accuvest received the reports by email. (*Id.*, ¶¶ 133–34, PageID #34.) Throughout Plaintiffs' investment relationship with the Income Collecting Fund, Mutual

Shareholder Services sent 450 net asset value reports.  (*Id.*, ¶ 21, PageID #8.)  In at least 140 of them, Mr. Anastasi is identified as the "Author" in the metadata.  (*Id.*, ¶ 22.)

To create the reports, Mutual Shareholder Services monitored accounts (such as bank, trust, and brokerage accounts) that held fund assets and discussed the fund with Abarbanel.  (*Id.*, ¶¶ 135 & 141, PageID #34 & 37.)  It "purport[ed] to verify the accuracy of its NAV Reports by getting prices of the underlying securities and making sure that the portfolio matche[d] the information Abarbanel provided."  (*Id.*, ¶ 136, PageID #34.)  Mr. Milcinovic "personally reviewed" the fund accounts daily and booked activity in the fund himself.  (*Id.*, ¶ 142, PageID #37.)  Mutual Shareholder Services was supposed to have performed a "monthly reconciliation of its records" and compare it to the records of the custodians for the Income Collecting Fund.  (*Id.*, ¶ 143.)  Mosaic Financial and Accuvest relied on representations in the net asset value reports to make investment decisions (*id.*, ¶¶ 32 & 138–39, PageID #11 & 35), specifically that "the securities were *over*-collateralized at 102%," "the lending agreements were secured by either cash or U.S. treasuries," and the "collateral was held at one of the Income Collecting Fund's custodian banks" which Mutual Shareholder Services checked daily.  (*Id.*, ¶ 24, PageID #9.)

Of the twenty investments Mosaic Financial made in the Income Collecting Fund, sixteen (totaling about $72.5 million) were made after Mutual Shareholder Services started sending Mosaic Financial and Accuvest the net asset value Reports on June 18, 2019.  (*Id.*, ¶ 214, PageID #52.)

### D. Collapse of the Income Collecting Fund

Unbeknownst to Plaintiffs and contrary to Abarbanel's representations, Abarbanel invested less than two percent of the invested assets in U.S. Treasury Bills and nearly 98 percent in uncollateralized securities lending agreements. (*Id.*, ¶¶ 95–96, PageID #24.) These actions led to an SEC investigation and a federal indictment. (*Id.*, ¶¶ 190–91 & 205, PageID #47–48 & 50.)

Plaintiffs allege that Mutual Shareholder Services was either complicit in Abarbanel's actions or reckless in failing to know about his improprieties. (*Id.*, ¶ 140, PageID #35.) For example, they plead that Mutual Shareholder Services failed to complete due diligence on Abarbanel, his companies, or their directors and asked no questions about changes in the fund's auditors and custodians. (*Id.*, PageID #36.) Further, they allege that Mutual Shareholder Services changed the descriptions of the fund's holdings and used improper accounting for the Income Collecting Fund's reverse repurchase agreements. (*Id.* ¶¶ 140 & 147, PageID #36–37.) Also, Mutual Shareholder Services allegedly knew that the Income Collecting Fund improperly transferred investment funds to "counterparty shell companies." (*Id.*, ¶¶ 167–73, PageID #42–44.)

Plaintiffs provide at least two examples where Mutual Shareholder Services failed to reconcile net asset value reports with "statements or other trustworthy information from the custodian accounts." (*Id.*, ¶ 149, PageID #38.)

*First*, on February 27, 2020, Mr. Milcinovic asked the Income Collecting Fund: "Can you forward the January month end Alliance Trust statement, our rec team is asking for a copy." (*Id.*, ¶ 151.) In response, the fund sent an

unverified, blurry, and illegible statement with information from multiple custodians for different accounts representing the incorrect share class. (*Id.*, ¶¶ 152–53, PageID #38–39.)  Plaintiffs allege that Mutual Shareholder Services did not question or investigate these responses. (*Id.*, ¶ 154, PageID #39.)

*Second*, Mutual Shareholder Services changed a custodian account from Alliance Trust to K&L Trust, an Israeli company. (*Id.*, ¶ 158.) K&L Trust sent account statements to Mutual Shareholder Services and Mr. Milcinovic that had "obvious red flags." (*Id.*, ¶ 156.)  For example, on January 8, 2021, K&L Trust sent Mutual Shareholder Services an account statement for the prior month that contained unverified information, a screenshot from Wikipedia of the definition of a certain financing statement, and financing statements filed for other securities lending transactions. (*Id.*, ¶ 157.)  Because Mutual Shareholder Services did not reconcile this account statement, it failed to learn that several transactions listed in them were not consistent with the prospectus and used counterparty shell companies. (*Id.*, ¶ 158, PageID #40.)

Plaintiffs allege that, through the failure of Mutual Shareholder Services to reconcile account data, the net asset value reports they sent contained material errors and did not accurately report the value or holdings of the Income Collecting Fund. (*Id.*, ¶¶ 21, 32, 159, 162 & 165, PageID #8, 11, 40, 41 & 42.)  For example, the securities detailed in the reports were not secured by U.S. Treasuries or held at Wells Fargo Bank or Interactive Brokers, as represented. (*Id.*, ¶¶ 31, 95–101, 127–28 &

224, PageID #11, 24–26, 32–33 & 54.)  Plaintiffs provide at least three specific examples of representations in the net asset value reports that they allege were false or misleading.

*First*, on September 4, 2020, Mosaic Financial invested $14 million in the Income Collecting Fund.  Upon receipt of the funds, the Income Collecting Fund loaned the money to National American Liquidity Resources, an action that terms of the prospectus did not contemplate.  (*Id.*, ¶¶ 166–68, PageID #42–43.)  On September 7, 2020, a director of the fund sent Mutual Shareholder Services a master securities loan agreement, which described the transaction between the fund and National American Liquidity Resources.  (*Id.*, ¶ 169, PageID #43.)  The net asset value report dated September 8, 2020 inaccurately represented that the Income Collecting Fund entered an overcollateralized transaction with collateral held at Wells Fargo or Interactive Brokers, and not a loan with National American Liquidity Resources.  (*Id.*, ¶¶ 168 & 173, PageID #43 & 44.)

*Second*, on December 28, 2020, Mutual Shareholder Services reported that the Income Collecting Fund held 102.5 million shares of "U.S. Treasuries 2.98% Lending Secured by 102% 2yr or less Treasuries or Cash held at Wells Fargo and/or [Interactive Brokers]."  (*Id.*, ¶ 174, PageID #44.)  The next day, after discussions with Abarbanel, the net asset value report for December 29, 2020 changed the description of the asset to "North American 2.98% on-demand line of credit."  (*Id.*, ¶¶ 175 & 179, PageID #45.)  In that same report,

9

Mutual Shareholder Services provided no explanation for the change, and did not list this change in a sheet entitled "Current Holdings Day Change." (*Id.*, ¶¶ 176–77.) Also, the prospectus did not authorize the Income Collecting Fund to issue on-demand lines of credit. (*Id.*, ¶ 178.)

*Third*, in May 2021, Plaintiffs allege that Mutual Shareholder Services failed to reconcile the net asset value reports against certain securities lending agreements and associated collateral. (*Id.*, ¶ 159, PageID #40.) On May 27, 2021, the net asset value report stated that the Income Collecting Fund's holding of "US Treasuries 2.45% Lending Secured by 102% 2yr or less Treasuries or Cash held at Wells Fargo and/or IB" was "worth more than $25.98 million." (*Id.*, ¶ 160.) Plaintiffs rely on the SEC investigation to demonstrate that this representation was false because "the Income Collecting Fund neither owned sufficient US Treasuries to enter into such a securities lending agreement, nor did the Fund's [brokerage or bank accounts] ever hold collateral associated with such a securities lending agreement." (*Id.*)

After learning of parallel SEC and federal criminal investigations, Abarbanel forcibly redeemed all investors in the Income Collecting Fund investors, except Mosaic Financial. (*Id.*, ¶ 35, PageID #12.) Those investors received their full investments back based on valuations that Mutual Shareholder Services provided. (*Id.*, ¶ 190, PageID #47.) Mutual Shareholder Services knew of these redemptions, did not warn Mosaic Financial, and continued to send net asset value reports containing false information. (*Id.*, ¶ 36, PageID #12.)

Plaintiffs allege that the misrepresentations in the net asset value reports allowed the Income Collecting Fund to violate the fund's stated investment strategy. (*Id.*, ¶ 27, PageID #10.) "Accuvest would not have advised, and Mosaic would not have made or held, these investments . . . *but for* the promise of validation and assurance provided by MSS's services . . . and in particular *but for* the daily NAV Reports." (*Id.*, ¶ 29.) Plaintiffs allege that they would not have made their investments "had MSS accurately disclosed the true and accurate state of the [Income Collecting Fund's] holdings, investment strategy and practices, and securities lending agreements." (*Id.*, ¶ 217, PageID #53.) "MSS simply buried its head in the sand and reported to Plaintiffs what Abarbanel said, not what the account statements showed." (*Id.*, ¶ 148, PageID #37–38.)

Before Abarbanel's indictment, Mosaic Financial and Accuvest submitted a request to Mutual Shareholder Services and the Income Collecting Fund to redeem Mosaic Financial's remaining $106 million investment in the fund. (*Id.*, ¶ 191, PageID #48.) Previously, Mosaic Financial made similar requests that the fund and Defendants fulfilled. (*Id.*) Mutual Shareholder Services and the Income Collecting Fund refused Mosaic Financial's redemption request because Abarbanel claimed that Mosaic Financial needed to undergo an "omnibus review process" with compliance and reporting officers. (*Id.*, ¶ 193.) Plaintiffs allege that Abarbanel's excuses were pretextual. (*Id.*, ¶ 194.) Mutual Shareholder Services' refusal to process Mosaic Financial's redemption request allegedly "gave Abarbanel time to continue stealing Mosaic's money." (*Id.*, ¶ 199, PageID #49.) In June 2021, without notice, Abarbanel

11

and the Income Collecting Fund initiated two transfers, one of $64 million and the other of $10 million, out of the fund and into other accounts.  (*Id.*, ¶¶ 200–01, PageID #49–50.)

Ultimately, Abarbanel pled guilty to fraud in the Southern District of New York and was sentenced to a term of 48 months in federal prison.  (*Id.*, ¶¶ 17 & 205, PageID #7 & 50.)  Additionally, the court ordered disgorgement of $76,944,744.90 from the Income Collecting Fund to be paid to Mosaic Financial.  (*Id.*, ¶ 204, PageID #50.)

## STATEMENT OF THE CASE

Based on these events, Plaintiffs' complaint asserts eight causes of action as follows:

| Count | Claim | Defendant(s) |
|-------|-------|--------------|
| 1 | Securities Fraud Section 10(b) and Rule 10b–5, 15 U.S.C. § 78j and 17 C.F.R. § 240.10b–5 | MSS |
| 2 | Fraudulent Misrepresentation (Purchaser Claims) | MSS and Milcinovic |
| 3 | Fraudulent Misrepresentation (Holder Claims) | MSS and Milcinovic |
| 4 | Negligent Misrepresentation (Purchaser Claims) | All Defendants |
| 5 | Negligent Misrepresentation (Holder Claims) | All Defendants |
| 6 | Breach of Fiduciary Duty | MSS |
| 7 | Ohio Securities Fraud, Ohio Rev. Code §§ 1707.43(A) and 1707.44(J) | MSS and Milcinovic |

| 8 | Utah Securities Fraud, Utah Code § 61–1–1 and –22 | MSS |
|---|---|---|

(ECF No. 1, PageID #51–67.)

Plaintiffs allege that the conduct of Mutual Shareholder Services "directly and proximately caused Mosaic and Accuvest to suffer substantial loss." (*Id.*, ¶ 218, PageID #53.) Specifically, Mosaic Financial alleges that it lost approximately $23.4 million in principal, $5 million of gains and accrued interest as reported in the net asset value reports, $1 million in advisory fees, and $1 million in legal fees. (*Id.*, ¶ 219.) Accuvest alleges that it lost over $570,000 in advisory fees and $40,000 in legal fees. (*Id.*, ¶ 220.) Defendants move to dismiss this case for failure to state a claim under Rule 12(b)(6). (ECF No. 18; ECF No. 18-1; ECF No. 21.) Plaintiffs oppose and requests an opportunity to amend their complaint if the Court finds any pleading deficiencies. (ECF No. 20.)

## JURISDICTION AND CHOICE OF LAW

The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Count 1 arises under federal law. The remaining counts assert State-law claims. The Court has subject-matter jurisdiction over these claims under 28 U.S.C. § 1332. Additionally, the Court has supplemental jurisdiction over these State-law claims under 28 U.S.C. § 1367.

Plaintiffs allege that Ohio law governs the common-law claims and argue that, if the law of another jurisdiction (such as New York, Utah, or the Bahamas) governs, the "elements of such claims are substantially similar across relevant jurisdictions." (ECF No. 1, PageID #54 n.49.) Defendants do not dispute that the common law claim

elements are substantially similar across relevant jurisdictions. (ECF No. 18, PageID #140 n.1.) Defendants rely on Ohio law in their motion to dismiss; therefore, the Court does the same in resolving the motion except regarding Count 8, which Plaintiffs bring under Utah law.

## GOVERNING LEGAL STANDARDS

The Court evaluates Defendants' motion to dismiss Plaintiffs' complaint for securities fraud under three different standards.

## I. Rule 8

In any civil action, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. American Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). To survive a motion to dismiss, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability." *Twombly*, 550 U.S. at 555, 557 n.5.

When analyzing a complaint under this standard, courts construe factual allegations in the light most favorable to the plaintiff, accepts them as true, and draws all reasonable inferences in the plaintiff's favor. *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015). But a pleading must offer more than mere "labels

and conclusions," because "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is a court required to accept "[c]onclusory allegations or legal conclusions masquerading as factual allegations[.]" *Eidson v. Tennessee Dep't of Child.'s Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

Therefore, the Court must distinguish between "well-pled factual allegations," which must be treated as true, and "naked assertions," which need not be. *See Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (cleaned up); *see also, e.g.*, *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 375 (6th Cir. 2011) (determining that because some of the plaintiff's factual allegations were "not well-pleaded[,]" "their conclusory nature 'disentitles them to the presumption of truth'"). Rule 8, to say nothing of the Private Securities Litigation Reform Act, "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

On a motion under Rule 12(b)(6), the Court's inquiry is limited to the content of the complaint, although it may also consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to or made part of the complaint. *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001). Defendants include in their recitation of the facts in their brief facts that do not appear in the complaint, directly or by implication. (ECF No. 18-1, PageID #131–33.) Because these facts are not integral to the complaint, go outside the pleadings, and are not

matters of public record, the Court disregards them in resolving the motion to dismiss. *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008). Therefore, the Court declines to convert the motion under Rule 12(b)(6) into one for summary judgment.

## II.    Rule 9(b)

In addition, fraud claims must meet Rule 9(b)'s heightened pleading standard. This Rule requires a plaintiff to "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). Generally, Rule 9(b) requires a plaintiff "(1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and where the statements were made; and (4) to explain what made the statements fraudulent." *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012) (citation omitted). But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Plaintiffs maintain that their common-law claims for breach of fiduciary duty and negligent misrepresentation are subject only to the notice pleading standard of Rule 8(a), not the heightened standard of Rule 9(b). (ECF No. 20, PageID #202.) Defendants do not contend otherwise. At least with respect to the negligent misrepresentation claim, courts disagree whether a heightened pleading standard applies. *See In re National Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 322 (S.D. Ohio 2007) (discussing the divide among district and circuit courts). Under Ohio law, "fraud and negligent misrepresentation are separate and distinct tort claims." *Id.* (collecting cases). For this reason, and because Defendants do not argue that the heightened standard of Rule 9(b) applies, the Court applies the standard of Rule 8 to Plaintiffs' negligent misrepresentation claims.

16

## III. Private Securities Litigation Reform Act

Under the Private Securities Litigation Reform Act of 1995, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 312 (2007); *Doshi v. General Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016). Also, the Reform Act requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 760 (N.D. Ohio 2020).

Where a plaintiff fails to meet these standards, "the court shall, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A). In determining whether to dismiss, courts consider not only the complaint, but also "plausible opposing inferences" that favor the defendant. *Doshi*, 823 F.3d at 1039 (citation and quotation omitted). The Reform Act's requirements are intended to be an "elephant-sized boulder" in the way of private securities fraud cases. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 461 (6th Cir. 2014). They limit "fishing expeditions," help "protect[] defendants' reputations from allegations of fraud," and narrow "potentially wide-ranging discovery to relevant matters." *Republic Bank*, 683 F.3d at 248 (cleaned up).

17

## ANALYSIS

### I.    Securities Fraud in Violation of Section 10(b) & Rule 10b-5 (Count I)

#### I.A.    Accuvest's Standing

Defendants argue that under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), Accuvest lacks standing to bring a securities claim because it never bought or sold a security.  (ECF No. 18-1, PageID #136.)  Plaintiffs argue that *Blue Chip Stamps* did not "purport to address whether both the investment advisor and the investment owner have standing" and that the Supreme Court's holding only seeks to prevent "*hypothetical* purchasers and sellers from bringing private securities fraud actions," and Mosaic Financial was not a hypothetical purchaser.  (ECF No. 20, PageID #204.)

Although Defendants present their position as a challenge to Accuvest's standing, the Court does not construe it as an attack on Accuvest's Article III standing.  Whether Accuvest has a cause of action under Section 10(b) does not implicate the Court's subject matter jurisdiction.  *See Morrison v. National Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010); *see also W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (differentiating between constitutional standing and the requirements to bring a Section 10(b) claim).  Indeed, there is no dispute that Accuvest has Article III standing to bring *some claim* against Defendants—Plaintiffs allege that Accuvest suffered an injury, that injury is fairly traceable to Defendants' conduct, and that injury is redressable by a favorable ruling.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992).

18

Whether that claim could be securities fraud under Section 10(b), however, requires the Court to consider whether Accuvest "falls within the class of plaintiffs whom Congress has authorized to sue" or, simply, whether Accuvest has a cause of action under the statute. *Lexmark Int'l, Inc. v. Static Control Components*, 572 U.S. 118, 128 (2014). To answer this question, courts turn to the traditional tools of statutory interpretation. *Id.*

The language of Section 10(b) and Rule 10b–5 does not explicitly create a private right of action. *Blue Chip Stamps*, 421 U.S. at 748–49. "When we deal with private actions under Rule 10b–5, we deal with a judicial oak which has grown from little more than a legislative acorn." *Id.* at 737. The statute and rule cover fraud only "in connection with the purchase or sale of any security." 18 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. For decades, the Supreme Court has interpreted this language to cover only those who purchased or sold a security. *Blue Chip Stamps*, 421 U.S. at 749; *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091–92 (1991); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007).

Some district courts hold that an investment advisor may qualify as a purchaser or seller to bring a securities fraud claim. *In re Goodyear Tire & Rubber Co. Secs. Litig.*, No. 5:03-cv-2166, 2004 WL 3314943, at *5 (N.D. Ohio May 12, 2004) (collecting cases). In those cases, however, the investment advisor exercised some discretion in determining what securities to buy and sell. *Id.* (finding the investment advisor capable of maintaining a Section 10(b) claim because it specifically had the authority to act as attorney-in-fact for its clients); *Weinberg v. Atlas Air Worldwide*

*Holdings*, 216 F.R.D. 248, 255 (S.D.N.Y. 2003) (holding that an investment advisor could be considered a "purchaser" under federal securities laws where it is the attorney-in-fact and has unrestricted decision-making authority to buy and sell stock).  In short, *Blue Chip Stamps* and its progeny demonstrate that to maintain a Section 10(b) cause of action, the plaintiff must have been on one end of the securities transaction and not played a peripheral or hypothetical role in the transaction.

Here, Accuvest was a third-party advisor to Mosaic Financial in the latter's investments in the Income Collecting Fund.  There is no dispute that Accuvest did not purchase or sell a security, and Plaintiffs make no allegation that Accuvest possessed any authority as attorney-in-fact or exercised discretion over making Mosaic Financial's investment decisions.

The Court is mindful to avoid expanding judicially created causes of action. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 165–67 (2008). And it declines to do so here.  As a matter of law, Accuvest cannot assert a claim for securities fraud under Section 10b and Rule 10b–5.  Therefore, the Court **GRANTS** Defendants' motion to dismiss to the extent it contends that Accuvest may not bring a securities claim.

### I.B.    Section 10(b) and Rule 10b–5

To state a claim for securities fraud under Section 10(b) of the Exchange Act of 1934 and Rule 10b–5, a plaintiff must establish the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and

(6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). Defendants argue that Plaintiffs fail to plead three of these elements:  (1) material misrepresentation or omission; (2) scienter; and (3) loss causation.  The Court addresses each in turn.

### I.B.1. Material Misrepresentation or Omission

Defendants argue that Mosaic Financial "failed to allege that MSS made a material misrepresentation" because, based on Defendant's own factual allegations, the only statements MSS made were the net asset value reports that "did nothing more than transmit daily financial information relating to the [Income Collecting Fund]."  (ECF No. 18-1, PageID #136–37.)  In response, Plaintiffs point to specific allegations in the complaint that detail how the net asset value reports were false or misleading.  (ECF No. 20, PageID #206–07.)  Notably, Defendants abandon their arguments on this element in their reply, focusing instead on loss causation and scienter.  (ECF No. 21, PageID #228.)

Where an alleged misrepresentation concerns "hard information"—"typically historical information or other factual information that is objectively verifiable"—it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading.  *Murphy v. Sofamor Danek Grp., Inc. (In re Sofamor Danek Grp., Inc.)*, 123 F.3d 394, 401 (6th Cir. 1997) (quotation omitted).

*False or Misleading*.  Here, the net asset value reports contained daily financial information that is objectively verifiable.  Plaintiffs provide specific allegations of how the information contained in the reports were false and unrepresentative of the

Income Collecting Fund's actual investment activities.  For example, according to the complaint, on May 27, 2021, the report was false because, despite representations in the reports to the contrary, "the Income Collecting Fund neither owned sufficient US Treasuries to enter into such a securities lending agreement, nor did the Fund's [brokerage or bank accounts] ever hold collateral associated with such a securities lending agreement."  (ECF No. 1, ¶ 160, PageID #40.)  On September 8, 2020, the report was false because it did not accurately report cash loaned to a third party, instead reporting that the Income Collecting Fund had entered into an overcollateralized lending transaction.  (*Id.*, ¶¶ 167–73, PageID #42–44.)  And on December 29, 2020, the report included a misrepresentation because it failed to indicate a change in the description of a holding from one secured in treasuries or cash to an on-demand line of credit.  (*Id.*, ¶¶ 174–77, PageID #44–45.)

Plaintiffs identify allegedly misleading statements, including their time, place, and content as Rule 9(b) and the Reform Act require.  *Republic Bank & Tr. Co*, 683 F.3d at 247.  Therefore, these statements contained in the net asset value reports suffice under Rule 10b–5 if they are material.  *Omnicare*, 769 F.3d at 470.

*Materiality*.  A misrepresentation is material "only if there is a substantial likelihood that a reasonable investor would have viewed the misrepresentation as having significantly altered the total mix of information made available." *Public Sch. Teachers Pension & Ret. Fund v. Ford Motor Co. (In re Ford Motor Co. Sec. Litig.)*, 381 F.3d 563, 570 (6th Cir. 2004) (cleaned up).  Misrepresentations are immaterial "only if they are so obviously unimportant to a reasonable investor that reasonable

minds could not differ on the question of their unimportance." *Id.* (internal quotation omitted).  Vague statements, obvious hyperbole, and "rosy affirmations" are decidedly immaterial.  *Id.* at 570–71.

Defendants make no argument why a reasonable investor would not find the net asset value reports generally or the data they provided specifically "important to the total mix of information available." *In re Ford Motor Co.*, 381 F.3d at 570–71. Plaintiffs allege that the reports falsely reported the value and holdings of the Income Collecting Fund based on specific information at particular times.  If this information was false or misleading, it is not the type of puffery or rosy affirmations "so vague, so lacking in specificity [as to] clearly constitute the opinions" of Mutual Shareholder Services.  *Id.*  Instead, they are financial statements with objective meaning and importance to a reasonable investor.  *In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 863–64 (W.D. Ky. 2014).  Therefore, Plaintiffs sufficiently plead that Defendants made material misrepresentations.

To the extent that Defendants argue the net asset value reports were not material misrepresentations because Defendants did not know they contained false information, the Court reserves that inquiry for the scienter analysis that follows. *Omnicare*, 769 F.3d at 471.

### I.B.2. Loss Causation

Defendants try to distance the actions of Mutual Shareholder Services in preparing the net asset value reports from Plaintiffs' losses by arguing that Abarbanel's criminal conduct caused the losses.  (ECF No. 18-1, PageID #139.) Defendants cite several points in Plaintiffs' complaint where they allege that

23

Abarbanel caused their losses. (*Id.* (citing ECF No. 1, ¶¶ 39, 128, & 200, PageID #13, 32–33, & 49–50).) For their part, Plaintiffs argue that they do not have to establish that "Defendants' misconduct is the sole and exclusive cause" of the alleged loss. (ECF No. 20, PageID #209.) Instead, they need only prove that Defendants' misconduct "is one *substantial cause*" of the alleged loss. (*Id.* (quoting *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 718 (E.D. Mich. 2010).)

### I.B.2.a. Loss Causation Theories

To state a claim for securities fraud, a plaintiff must prove "that the act or omission of the defendant alleged to violate" Rule 10b-5 "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). The requirement that Plaintiff prove loss causation is "not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005). Rather, "it is meant to prevent disappointed shareholders from filing suit merely because their shares have lost value and then using discovery to determine whether the loss was due to fraud." *Norfolk Cnty. Ret. Sys. v. Community Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017) (citing *Dura Pharms.*, 544 U.S. at 347–48). At the pleading stage, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms.*, 544 U.S. at 347. The element of loss causation is not subject to the heightened pleading standards of Rule 9 or the Reform Act, but instead the notice pleading standard of Rule 8. *Id.* at 346.

The Sixth Circuit recognizes two theories by which a plaintiff may plead loss causation: (1) a corrective disclosure; and (2) materialization of a concealed risk.

*Ohio Pub. Emps. Ret. Sys. v. Federal Home Loan Mortg. Corp.*, 830 F.3d 376, 384–85 (6th Cir. 2016) ("*OPERS*").  There is no allegation that Plaintiffs suffered economic loss after the truth behind the representations of Mutual Shareholders Services became known to the market; therefore, the Court analyzes loss causation only under the latter theory.

Under the materialization of the risk theory, a plaintiff need not allege that the misstatements at issue caused its entire loss.  *In re Lehman Bros.*, 799 F. Supp. 2d at 305 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005)).  "At the pleading stage, Plaintiff[s] need only allege a plausible claim that Defendants' false and misleading statements caused some portion of its losses." *Plagens v. Deckard*, No. 1:20-cv-2744, 2023 WL 2711263, at *24 (N.D. Ohio Mar. 30, 2023); *see also OPERS*, 830 F.3d at 384 (requiring that plaintiffs plead more than a tenuous connection between the concealed risk and the loss but not necessarily rule out "more likely explanations" for the loss).  In *Lehman Brothers*, the plaintiffs adequately pled loss causation by alleging that the materialization of the risk of Lehman's overleveraged status and investments in subprime assets, which the company concealed through its misstatements, caused some part of their losses.  799 F. Supp. 2d at 306.  By contrast, in *Lentell*, which was a similar case, the plaintiffs failed to make any allegation that the defendant's misstatements caused any part of their loss.  396 F.3d at 175–76.  The district court dismissed the claim, at least in part, for that reason.  *Id.*

### I.B.2.b. Materialization of the Risk

At one level, Abarbanel undoubtedly caused the losses.  But Plaintiffs contend that they took steps to withdraw from the Income Collecting Fund and Defendants took actions that exposed them to the losses at issue.  Additionally, Plaintiffs allege that they relied on the net asset value reports, which Defendants prepared and in which Defendants made misrepresentations about the investments of the Income Collecting Fund.  One risk Defendants assumed when preparing the reports was that the fund's investments did not track the description in the prospectus, including by providing direct lines of credit and cash to third parties and holding assets in uncollateralized funds—not in U.S. Treasuries or cash at custodian banks.  According to the complaint, that risk materialized when Abarbanel made investments that the prospectus did not contemplate.  Plaintiffs allege that those transactions, not accurately reflected in the net asset value reports, caused them to lose at least some part of their total investment.

While Plaintiffs did make some investments in the Income Collecting Fund before receiving Defendants' net asset value reports, Plaintiffs need not prove their whole loss through this theory.  Plaintiffs adequately allege that they would have been spared an "ascertainable portion of that loss absent the fraud," *Lentell*, 396 F.3d at 175, because they would "not have made and would have sought to rescind the entirety" of their investments "had MSS accurately disclosed the true and accurate state of the [Income Collecting] Funds' holdings, investment strategy and practices, and securities lending agreements"  (ECF No. 1, ¶ 217, PageID #53).

Moreover, the facts as alleged do not present the type of situation where Plaintiffs use Section 10(b) as a *post hoc* measure to recover losses from the normal risks of investing. *Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013). Nor are Plaintiffs required to plead the most likely cause of their loss at this stage. Under the allegations in the complaint, Abarbanel's actions were not an intervening cause of loss but rather the materialization of a risk Defendants' misrepresentations concealed.

Plaintiffs sufficiently allege that Defendants' misrepresentations enabled Abarbanel to engage in improper transactions with fund assets. "Having considered the relationship between the risks allegedly concealed and the risks that subsequently materialized," and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that Plaintiffs plausibly allege loss causation. *OPERS*, 830 F.3d at 388 (quotation omitted) (plaintiffs sufficiently pled loss causation by alleging that the defendant made material misrepresentations to conceal certain risks, which resulted in a drop in the stock price when they were realized, and that the plaintiffs would not have invested in the stock had they known the truth).

### I.B.3. Scienter

Scienter "is the lynchpin of most" Section 10(b) claims. *Albert Fadem Tr. v. American Elec. Power Co.*, 334 F. Supp. 2d 985, 1006 (S.D. Ohio 2004). To allege it sufficiently, a plaintiff must demonstrate that each defendant "had a mental state embracing intent to deceive, manipulate or defraud." *Omnicare*, 769 F.3d at 472. "[T]he Supreme Court set forth a three-part test used by lower courts to determine the sufficiency of a plaintiff's scienter allegations." *Dougherty*, 905 F.3d at 979 (citing

27

*Tellabs*, 551 U.S. at 322). This inquiry requires lower courts to: (1) "accept all factual allegations in the complaint as true"; (2) "consider the complaint in its entirety" to determine "whether all of the facts alleged, taken collectively, give rise to a *strong inference of scienter*"; and then (3) "take into account plausible opposing inferences" to decide whether "a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322–24 (emphasis added).

To aid in this inquiry, and to determine if there is a "strong inference of scienter" that is "cogent and at least as compelling as any opposing inference," *id.*, the Sixth Circuit looks to "a non-exhaustive list of nine factors," *Doshi*, 823 F.3d at 1039–40. They include whether there are allegations of:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Dougherty*, 905 F.3d at 979 (quoting *Omnicare*, 769 F.3d at 473); *see Helwig*, 251 F.3d at 552. A strong inference of scienter may be inferred from circumstantial evidence. *Tellabs*, 551 U.S. at 323.

Although the Sixth Circuit's *en banc* decision in *Helwig* is no longer good law when it comes to the legal standard for scienter, its framework remains useful for

analyzing factual allegations.  *See, e.g., Dougherty*, 905 F.3d at 979 (applying *Helwig*); *Pittman v. Unum Grp.*, 861 F. App'x 51, 57 (6th Cir. 2021) ("Our starting point is *Helwig*."); *Doshi*, 823 F.3d at 1039–43 (applying the *Helwig* factors); *Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, No. 3:16-cv-1106, 2019 WL 6251435, at \*3–7 (N.D. Ohio Nov. 22, 2019) (same).  At the same time, however, courts "evaluate scienter by looking at 'all the allegations holistically.'"  *Pittman*, 861 F. App'x at 54 (quoting *Tellabs*, 551 U.S. at 326).  "A complaint adequately pleads scienter" under the Reform Act "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Matrixx*, 563 U.S. at 48 (quotation omitted).

In the end, scienter remains difficult to plead and hard to prove.  Compared to a run-of-the-mill civil action, a plaintiff alleging securities fraud must do "more— much more—" to survive a motion to dismiss.  *Albert Fadem Trust*, 334 F. Supp. 2d at 1006.  And although Rule 12(b)(6) requires that all inferences be drawn in the plaintiff's favor, "*inferences of scienter do not survive if they are merely reasonable.*"  *Id.*  (quoting *Campbell v. Lexmark Int'l Inc. (In re Lexmark Int'l Sec. Litig.)*, 234 F. Supp. 2d 680, 683 (E.D. Ky. 2002)).  At this stage, a plaintiff's allegations about scienter must be cogent and at least as compelling as any opposing inference of non-fraudulent intent.  *See Tellabs*, 551 U.S. at 324.

A plaintiff may establish scienter by demonstrating either a "knowing and deliberate intent to manipulate, deceive, or defraud" or "recklessness."  *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 812 (6th Cir. 2022) (quoting

*Doshi*, 823 F.3d at 1039). "Recklessness is . . . highly unreasonable conduct which is an extreme departure from the standards of ordinary care," where the "danger . . . must at least be so obvious that any reasonable man would have known of it." *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (internal citations and quotation marks omitted). It requires something more than negligence and is "akin to conscious disregard," and "typically require[s] multiple, obvious red flags, demonstrating an egregious refusal to see the obvious, or to investigate the doubtful." *Doshi*, 823 F. 3d at 1039 (internal citations and quotation marks omitted).

### I.B.3.a. Allegations

Plaintiffs identify three categories of allegations that they contend support scienter. They argue that Defendants: (1) disregarded the most current factual information before making statements (the sixth *Helwig* factor); (2) acted in conscious disregard of known risks and red flags; and (3) failed to investigate or acquire information that would have revealed that its statements were false or misleading. (ECF No. 20, PageID #208–09.) Defendants do not address any of the *Helwig* factors, instead arguing that Plaintiffs fail to plead scienter because they assume that Mutual Shareholder Services had a duty to confirm the fund's assets before preparing the net asset value reports and they fail to allege "why or how MSS not obtaining [information regarding the fund] was reckless." (ECF No. 18-1, PageID #138.)

Plaintiffs' arguments for scienter are all related and rely on similar allegations in the complaint; therefore, the Court will consider them together. Plaintiffs point to several paragraphs of the complaint where they allege that Mutual Shareholder Services and Mr. Milcinovic had the ability and duty to confirm the information in

30

the net asset value reports. (ECF No. 20, PageID #209 (citing ECF No. 1, ¶¶ 30–31, 110, 127, 142, 143 & 150–52, PageID #10–11, 28, 32 & 37–38).) Then, Plaintiffs cite several paragraphs in the complaint where they allege that, despite Defendants' purported review and reconciliation of custodian account statements (or lack of review), they sent inaccurate net asset reports to Plaintiffs daily. (*Id.* (citing ECF No. 1, ¶¶ 12, 19, 21, 32, 44, 57, 135–36 & 141–43, PageID #5, 8, 11, 14, 17, 34 & 37).)

Plaintiffs allege that Mutual Shareholder Services and Mr. Milcinovic had the ability to confirm information in the net asset value reports because "they had access to the Income Collecting Fund's custodian accounts and account statements, monitored them, and/or spoke with Abarbanel about them." (ECF No. 1, ¶¶ 30 & 135, PageID #10–11 & 34.) They identify Defendants' duty to confirm the reports and allege, on information and belief, that a 2018 accounting agreement between Mutual Shareholder Services and the Income Collecting Fund required Mutual Shareholder Services to "[p]rovide the [Income Collecting] Fund and its investment advisor with daily portfolio valuation, net asset value calculation and reconcile all appropriate data with each [Income Collecting] Fund's custodian/custodians." (*Id.*, ¶ 110, PageID #28 (emphasis removed).) According to the complaint, Mutual Shareholder Services purported to "verify the accuracy of the NAV Reports by getting prices of the underlying securities and making sure that the portfolio match[ed] the information Abarbanel provided on fund investments." (*Id.*, ¶ 136, PageID #34.)

Plaintiffs allege that Mutual Shareholder Services knew or was reckless in not knowing that certain representations regarding repurchase agreements in the

31

January 2019 prospectus were false, because it conducted "daily review and reconciliation of the custodian accounts that were supposed to be holding collateral." (*Id.*, ¶ 127, PageID #32.)  In practice, however, the repurchase agreements did not occur according to the methodology described in the prospectus.  (*Id.*)

According to the complaint, Mr. Milcinovic personally reviewed the custodian accounts (where the fund's collateral was supposedly held) daily and performed the "daily booking of the [transaction] activity within the fund."  (*Id.*, ¶ 142, PageID #37.) Plaintiffs allege that Mutual Shareholder Services was "supposed to have performed monthly reconciliation of its records of the [Income Collecting Fund's] holdings compared to the records of the Fund's custodians," but if that had happened, then Mutual Shareholder Services would have known that the net asset value reports were false.  (*Id.*, ¶ 143; *id.*, ¶¶ 12, 32 & 57, PageID #5, 11 & 17) (alleging failure to review and reconcile account statements then sending false and misleading NAV Reports to Plaintiffs).)  Mr. Anastasi allegedly was involved in calculating trial balances for the Income Collecting Fund and prepared net asset reports on a daily basis.  (*Id.*, ¶¶ 50 & 129, PageID #15 & #33.)

On information and belief, Plaintiffs claim that Mutual Shareholder Services failed to conduct any reasonable diligence of the statements it received from the fund despite obvious red flags.  (*Id.*, ¶¶ 19, 31 & 150–52, PageID #8, 11 & 38.)  For example, on February 27, 2020, Mr. Milcinovic sought out a statement from the fund regarding the holdings in a specific custodian account.  (*Id.*, ¶ 151, PageID #38.)  In response, the fund sent him an "unverified" and "illegible" document with information

regarding holdings from two different custodian accounts related to another share class. (*Id.*, ¶¶ 31 & 152–53, PageID #11 & 38–39.)  On information and belief, Mutual Shareholder Services did not further investigate or verify this statement. (*Id.*, ¶ 154, PageID #39.)

At bottom, Plaintiffs allege that Mutual Shareholder Services failed to review and reconcile the net asset value reports and then sent inaccurate reports despite red flags that would have been obvious had it done its job.

### I.B.3.b. Holistic Analysis of Scienter

As the Supreme Court's decision in *Matrixx* requires, the Court reviews "all the allegations holistically."  563 U.S. at 48 (quoting *Tellabs*, 551 U.S. at 326). Additionally, as courts within this Circuit continue to do following *Matrixx*, the Court considers the allegations of the complaint under *Helwig.  See, e.g.*, *Dougherty*, 905 F.3d at 979 (applying *Helwig*); *Pittman*, 861 F. App'x at 57 ("Our starting point is *Helwig*.").    Defendants do not cite any *Helwig* factors in their analysis, rebut any of the cases on which Plaintiffs rely, or provide any legal analysis beyond a general description of the Sixth Circuit's scienter standard.

### I.B.3.b.i. Sixth *Helwig* Factor

Plaintiffs rely on the sixth *Helwig* factor—disregard of the most current factual information before making statements—to support their scienter allegations. (ECF No. 20, PageID #208.)  Sufficient allegations of a defendant's disregard of the most current factual information before making statements supports an inference of scienter based on recklessness. *City of Taylor*, 29 F.4th at 813 (affirming inference of recklessness because the company's chief executive officer was "intimately aware" of

grave issues at the company and instead of "sharing the full picture with investors, he brushed off concerns and reported major profits"); *Dougherty*, 905 F.3d at 981 (describing the plaintiff's "theory of scienter [as] straightforward" because after meeting with FDA, a company announced that it would not need to complete a specific certification for a drug it manufactured, when in reality FDA published minutes from the meeting stating the opposite); *Plagens*, 2023 WL 2711263, at *27 (finding an inference of recklessness concerning the defendants' misleading "hard information" with objective and verifiable data because they had "access to information contradicting their public statements").

A plaintiff's scienter allegations under this theory, however, cannot hinge only on the presumption that a defendant generally knows information or has access to certain information because of that individual's position in the company. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688, 693 (6th Cir. 2004) (abrogated on other grounds) (concluding that the sixth *Helwig* factor was not present where the plaintiffs failed to allege specific facts, such as how or when the defendant became aware of the accounting improprieties). This rule acknowledges the fact that executives may not know about "accounting issues . . . relatively arcane in nature and scope" that do not "pertain[] to central, day-to-day operational matters." *Id.* at 688; *D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 740 (E.D. Mich. 2003) (finding conclusory allegations of access to "unspecified 'internal records'" insufficient to support an inference of scienter).

34

Instead, the complaint must allege specific facts or circumstances that would be suggestive of an individual defendant's knowledge—for example, having possession of and reviewing current-in-time reports of objective data and subsequently issuing false reports based on that data. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 684 (6th Cir. 2005); *Sparling v. Daou*, 411 F.3d 1006, 1023–24 (9th Cir. 2005). Such is the case here. Plaintiffs' allegations do not solely depend on the position of any individual Defendant. Instead, they allege that Mr. Milcinovic and Mr. Anastasi had access to records and hard information that raised multiple obvious red flags, if only they had reviewed it.

### I.B.3.b.ii. Failure to Investigate

Plaintiffs cite *Securities and Exchange Commission v. George*, 426 F.3d 786, 798 (6th Cir. 2005), for the proposition that a failure to investigate or acquire information that would have revealed that statements were false or misleading adequately pleads scienter. (ECF No. 20, PageID #209.) That case involved a Ponzi scheme led by three principal brokers. One broker asserted that he was unaware that the scheme was illegitimate and believed that the money distributed to him by another broker came from legitimate profits from the investments. The Sixth Circuit affirmed the district court's reasoning, *id.* at 797–98, that the broker's "failure to investigate the veracity of the [investment scheme] suffced to establish scienter" especially given his prior experience in the securities industry, *SEC v. Thorn*, No. 2:01-cv-290, ECF No. 580, PageID #1328 & #1341–42 (S.D. Ohio Oct. 14, 2003).

Absent specific allegations to the contrary, a fund administrator may not be under the same duty to investigate as a broker. *See, e.g.*, *In re Van Wagoner Funds*,

*Inc. Sec. Litig.*, No. C 02-03383, 2004 U.S. Dist. LEXIS 24867, at *17–18 (N.D. Cal. July 27, 2004) (finding scienter pleadings against a fund administrator insufficient because the plaintiffs did not plead that the administrator "had a separate duty to inquire and derive the valuations for restricted securities independently").  However, the Sixth Circuit has suggested that a plaintiff may sufficiently plead recklessness if it alleges facts establishing that defendants "knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did." *In re Comshare Inc. Secs. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999). Plaintiffs' allegations that Mutual Shareholder Services and Mr. Milcinovic, who allegedly personally reviewed the custodian accounts holding the Income Collecting Fund's collateral, disregarded or failed to acquire current information even as they passed along contrary daily reports pleads scienter under the law of this Circuit.

### I.B.3.c. Cogent Inference of Scienter

"A complaint adequately pleads scienter" under the Reform Act "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx*, 563 U.S. at 48 (quotation omitted).  When viewed holistically, Plaintiffs plead facts sufficient to support a cogent inference of scienter against Mutual Shareholder Servicers through the direct personal involvement of Mr. Milcinovic and Mr. Anastasi on a daily basis with the Income Collecting Fund's accounts and assets and the reports about them. *Omnicare*, 769 F.3d at 476.  Taking the facts alleged as true, Mr. Milcinovic had responsibility for reviewing the net asset value reports daily and reconciling information he received from Abarbanel and the custodian accounts

36

holding the collateral.  Mr. Anastasi was involved in calculating the trial balance of the Income Collecting Fund.  In practice, they allegedly disregarded contradictory information or failed to uncover inconsistencies in the fund's reporting despite obvious red flags.  Then, the daily net asset value reports from Mutual Shareholder Services made material misrepresentations to Mosaic Financial.

Plaintiffs' allegations involving Mr. Milcinovic and Mr. Anastasi do not rely solely on their positions at Mutual Shareholder Services.  Instead, they rely on specific allegations of their possession and review of current reports of objective financial data and subsequent inaccurate reporting of that data.  At the pleading stage, these allegations suffice to support scienter based on recklessness.  *City of Monroe*, 399 F.3d at 684; *Sparling*, 411 F.3d at 1023–24.  Moreover, Mr. Milcinovic and Mr. Anastasi either "knew or could have known" material contrary information through their regular review, reconciliation, and other efforts and involvement with their reporting on the Income Collecting Fund, regardless of the existence of any independent duty to investigate.  *See In re Comshare*, 183 F.3d at 553.

### I.B.3.d. Strong Inference of Scienter

Finally, in addition to being cogent, Plaintiffs' allegations of scienter must be at least as compelling as any opposing inference of non-fraudulent intent.  *See Tellabs*, 551 U.S. at 324.  On this score, the record presents a close question.  On the one hand, Plaintiff has the benefit of all the allegations previously discussed.  They boil down to Mutual Shareholder Services preparing daily reports containing materially false or misleading representations as shown in hard information and data to which Mr. Milcinovic and Mr. Anastasi had access.  On the other hand, Abarbanel

committed criminal fraud, there are no allegations that any Defendant participated in that fraud or did anything other than serve as a transfer agent, and Mutual Shareholder Services received a comparatively small fee for its work (about $5,000 per month).  Nor is there any allegation that the firm or any of its principals benefitted from the fraud.

For two reasons, the Court concludes that Plaintiffs' allegations give rise to a strong inference of scienter at least as strong as competing non-fraudulent inferences and explanations—if barely.  First, Mr. Milcinovic and Mr. Anastasi each had daily involvement with the false or misleading reports and true information about the fund. Based on the allegations here, this degree of direct involvement coupled with daily access to true information and hard data makes the inference of recklessness strong.

Second, they ignored multiple obvious red flags pled with specificity.  (*See, e.g.*, ECF No. 1, ¶¶ 151–54, PageID #38–39; ¶¶ 156–58, PageID #39–40.)  For example, on February 27, 2020, Mr. Milcinovic asked the Income Collecting Fund for a specific account statement and received a questionable or suspicious response that should have, but did not, prompt further inquiry.  (*Id.*, ¶¶ 151–54, PageID #38–39.)  As another example, in January 2021, a trust sent Mutual Shareholder Services a statement containing information about incorrect transactions and a Wikipedia screenshot.  Still, Mutual Shareholder Services allegedly failed to reconcile the statement or undertake other diligence.  (*Id.*, ¶¶ 156–58, PageID #39–40.)

These examples involve recklessness on the part of Mutual Shareholder Services independent from Abarbanel's criminal conduct.  It is at least as compelling

38

to infer that a fraudulent intent (such as recklessness) accounts for these failures as mere negligence or a third party's criminal conduct.  According to the complaint, Mutual Shareholder Services received but did not investigate allegedly obvious misrepresentations from the fund as well as information from other entities bearing red flags.  The complaint pleads at least some instances of conscious disregard that allegedly occurred without direct interference from Abarbanel.  Although the Reform Act imposes a high pleading standard, difficult to achieve, this case presents the rare case with allegations that rise to that level, though the question is close.

*     *     *

Plaintiffs sufficiently allege that Defendants made material misrepresentations that caused at least some part of their loss, with the requisite intent to defraud.  Accordingly, the Court **DENIES IN PART** Defendants' motion to dismiss Plaintiffs' Section 10(b) claim in Count 1.

## II.    Fraudulent Misrepresentation (Count 2 and Count 3)

In Count 2 and Count 3, Plaintiffs bring claims for fraudulent misrepresentation against Mutual Shareholder Services and Mr. Milcinovic.  Count 2 alleges that these Defendants made false statements to induce Plaintiffs to invest in the Income Collecting Fund.  (*See* ECF No. 1, ¶ 228, PageID #55.)  Count 3 alleges false statements made to keep Mosaic Financial's investments in the fund.  (*Id.*, ¶ 234, PageID #56.)  Like the parties (ECF No. 18, PageID #140; ECF No. 20, PageID #210), the Court considers these claims together.

Under Ohio law, a fraudulent misrepresentation requires: (1) a representation or, when there is a duty to disclose, a concealment of a fact; (2) which is material to

39

the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the representation or concealment; and (6) an injury proximately caused by that reliance. *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 1998-Ohio-294, 700 N.E.2d 859 (1998). A claim of fraudulent misrepresentation arises where "a party is induced to enter into an agreement through fraud or misrepresentation" and involves "a general duty to avoid wrongful conduct that induces a party to enter into a contract." *ITS Fin., LLC v. Advent Fin. Servs, LLC*, 823 F. Supp. 2d 772, 779 (S.D. Ohio 2011) (citations omitted).

Defendants argue that Plaintiffs fail to allege that Mutual Shareholder Services and Mr. Milcinovic made the alleged misrepresentations at issue knowingly or with utter disregard to their truth and with the intent of misleading Plaintiffs. (ECF No. 18, PageID #141–43.) Also, they contest proximate causation. (*Id.*, PageID #144.)

### II.A.   Knowledge or Utter Disregard of the Truth

Knowledge of falsity can be inferred from circumstantial evidence. *Doyle v. Fairfield Mach. Co., Inc.*, 120 Ohio App.3d 192, 208, 697 N.E.2d 667, 677 (1997). Ohio courts find knowledge of falsity where a person makes a statement (1) knowing it is false or (2) without knowledge of its truth or falsity. *Id.*; *Pumphrey v. Quillen*, 165 Ohio St. 343, 347, 135 N.E.2d 328, 331 (1956). When pleading a claim based on a false representation, Ohio law permits a plaintiff to proceed against a defendant who (1) "misstates his own state of mind . . . as by saying that he knows [a fact's] existence

40

when he is conscious that he merely believes it to exist, or has no belief one way or the other of its truth or falsity"; or (2)  "asserts a fact as of his own knowledge, or so positively as to imply that he has knowledge, when he knows that he has not sufficient information to justify it." *Doyle*, 697 N.E.2d at 677 (quoting *Pumphrey*, 102 Ohio App. at 173, paragraph one of the syllabus).

Taking Plaintiffs' allegations as true, they allege that from 2019 to 2021 Defendants issued inaccurate net asset value reports despite having access to "some or all the Income Collecting Fund's bank or brokerage accounts" and discussing the fund's holdings with Abarbanel.  (ECF No. 1, ¶¶ 141 & 227, PageID #37 & #55.) Plaintiffs allege that the information Defendants regularly reviewed contradicted the information in the reports.  Based on Defendants' purported daily review, verification, and reconciliation of the net asset value reports, it is reasonable to infer that Defendants knew the reports contained inaccurate data.  Defendants' arguments to the contrary overlook Plaintiffs' specific factual allegations on this point. Moreover, these allegations support allegations that Mutual Shareholder Services and Mr. Milcinovic utterly disregarded the truth or falsity of the net asset value reports.  If Defendants did not perform their reviews and reconciliation, then they had "no belief one way or the other" of the report's truth or falsity but made but made statements implying that they did know the details of fund's holdings.  *Doyle*, 697 N.E.2d at 208.

Defendants cite two cases for the contention that "[n]umerous courts have refused to find that a defendant had utter or reckless disregard for the truth based

41

on a plaintiff's contentions that facts existed at the time that the statement was made that (if discovered) would demonstrate that the statement was not true." (ECF No. 18-1, PageID #141.)  Both cases are procedurally and factually inapposite.

*First*, *Dovico v. Kotlyn*, No. 56568, 1990 WL 6988, at *2 (Ohio Ct. App. Feb. 1, 1990), involved an appeal from a bench trial where the trial court found that there was no evidence the seller of a home knowingly misrepresented the fact that the basement had no water damage.  The seller denied having any knowledge of water damage, a neighbor testified that she had been in the basement multiple times and had not seen any water damage, and the purchase agreement noted that there were no verbal representations relied on in finalizing the sale.  *Id.*  Ultimately, the trial court found, and the appellate court affirmed, that the seller made no false representation.  Unlike the seller in *Dovico*, who would have had to discover the water damage, Plaintiffs here allege that Defendants had contradictory information available when they made their representations in the net asset value reports but sent the reports anyway.  In any event, the evidence there established that the seller made no false statement.  In contrast, the procedural posture of this case requires taking Plaintiffs' allegations as true.

*Second*, Defendants rely on *Maruschak v. Schafer*, 2015-Ohio-5340, at ¶ 1 (Ohio Ct. App. Dec. 21, 2015).  There, the trial court granted summary judgment to the sellers of property who failed to disclose the existence of mold and water damage.  Like *Dovico*, the case arises in a procedural posture supported by the development of a factual record.  Also like *Dovico*, the sellers denied having knowledge of any

42

moisture problems in the home. *Id.* at ¶ 21. Nor was there evidence that the sellers should have had any such knowledge because the water damage was discovered several months after the buyer purchased the home and removed some carpeting. *Id.* at ¶¶ 21–22. In contrast, Plaintiffs here allege that Defendants had knowledge of inconsistencies before sending the net asset value reports.

### II.B.  Intent to Mislead

Defendants argue that nothing in the complaint "provides a basis for concluding that MSS or Milcinovic would want to mislead" Plaintiffs or why Defendants "would even want Mosaic to invest in the Income [Collecting] Fund." (ECF No. 18-1, PageID #143.) Plaintiffs argue that Defendants had knowledge of the falsity of the net asset value reports but sent them anyway to induce continued investment in the fund. (ECF No. 20, PageID #212.) Moreover, Plaintiffs argue, that "MSS's representations regarding the Income Collecting Fund's assets are a representation that MSS had knowledge of the Income Collecting Fund's assets"; therefore, "Defendants intended to mislead Plaintiffs regarding (if nothing else) Defendants' knowledge of the Income Collecting Fund's holdings and net asset value." (*Id.* (cleaned up) (applying *Doyle*, 120 Ohio App. 3d at 208).) Defendants reply by arguing that Plaintiffs conflate the knowledge and scienter elements of fraud and fail to plead that they "intended to defraud or deceive" because the fact that they "could have discovered facts that would have proved" the reports to be inaccurate is not enough. (ECF No. 21, PageID #232.)

Plaintiffs may allege intent to mislead generally. Fed. R. Civ. P. 9(b). Because direct evidence rarely demonstrates intent, Ohio law allows intent to be inferred from

the totality of the circumstances.  *Doyle*, 697 N.E.2d at 667.  Here, the totality of the circumstances supports an inference of intent.  If nothing else, the allegations suggest that Defendants wanted to maintain Mosaic Financial's investment in the Income Collecting Fund to maintain the relationship of Mutual Shareholder Services with the fund.  As Plaintiffs put it, if investors "did not accept and rely on Defendants' honesty and competence, the [Income Collecting] Fund would have no reason to tout MSS's independent fund administrator services in its prospectuses and pay MSS for its accounting and administration services, including calculating and generating NAV Reports."  (ECF No. 20, PageID #212 (citing ECF No. 1, ¶¶ 10, 48, 104–12, 129 & 165, PageID #4–5, 15, 26–30, 33 & 42).)

Again, Defendants' arguments to the contrary ignore the specific factual allegations regarding their knowledge of contradictory data and information uncovered or available through their regular review and reconciliation procedures. Taking all the facts alleged as true and construing them in Plaintiffs' favor, as the Court must at this stage of the proceedings, it is reasonable to infer that Defendants, with the requisite degree of knowledge, sent the net asset value reports with the intention to mislead Plaintiffs into relying on them in making their investment decisions.  *See Mitsui Sumitomo Ins. Co. of America v. Vertiv Corp.*, No. 2:23-cv-1398, 2023 WL 8237399, at *4 (S.D. Ohio Nov. 28, 2023) (citing *Starinki v. Pace*, 41 Ohio App. 3d 200, 204, 535 N.E.2d 328, 333 (1987)).

### II.C.  Proximate Cause

Under Ohio law "[e]ven where an act is not the sole cause of the injury, that act can still be sufficient to satisfy the element of proximate cause so long as it put in

44

motion the sequence of events leading to the injury." *Doyle*, 697 N.E.2d at 679.  For this reason, Defendants' argument that they were not the "independent" cause of Plaintiffs' alleged harms misstates the applicable law.  (ECF No. 18-1, PageID #144.)  Proximate causation focuses on whether the plaintiff's injury was caused by its reliance on the defendant's misrepresentations. *Cohen v. Lamko, Inc.*, 10 Ohio St. 3d 167, 169, 462 N.E.2d 407, 409 (1984).  It is not necessary for the defendant to have anticipated the particular injury; it is sufficient that the defendant's act is likely to result in an injury to someone. *Doyle*, 697 N.E.2d at 679.  Ultimately, proximate cause presents a question of fact for the jury. *Strother v. Hutchinson*, 67 Ohio St. 2d 282, 287, 423 N.E.2d 467, 471 (1981).

Taking Plaintiffs' allegations as true, Plaintiffs relied on the misrepresentations in the net asset value reports to their detriment:  the inaccuracies in the reports effectively helped conceal Abarbanel's improper investment activities resulting in Plaintiffs' losses.  Also, Plaintiffs allege that they would not have invested in the fund had Mutual Shareholder Services accurately reported the fund's value, holdings, and investment strategies.  In this way, the inaccurate reports "put in motion the sequence of events" leading to Plaintiffs' losses. *Doyle*, 697 N.E.2d at 679.  These allegations suffice to survive a motion to dismiss. *See Strother*, 423 N.E.2d at 471.

Defendants maintain that their distribution of the net asset value reports could not have "'put into motion the sequence of events leading to the injury'" because Mosaic Financial invested in the Fund before receiving the reports.  (ECF No. 21,

PageID #233.)  That argument fails to meet the gravamen of the allegations in Count 3.  After all, according to the complaint, the false information in the reports allegedly led Mosaic Financial to maintain its investment in the fund.  Even as to the purchase claim in Count 2, this argument misses the mark.  Mosaic Financial made investments over nearly two years based on other representations of Defendants as well.  (*See* ECF No. 1, ¶¶ 92 & 214, PageID #24 & 52.)  How much, if any, of Plaintiffs' losses their reliance on the net asset value reports remains for further development in discovery.

*     *     *

Taking the allegations as true and construing them in Plaintiffs' favor, Plaintiffs plead claims for fraudulent misrepresentation.

## III.  Negligent Misrepresentation (Count 4 and Count 5)

Against all Defendants, in Count 4 and Count 5, Plaintiffs make claims for negligent misrepresentation parallel to those in Count 2 and Count 3 for fraudulent misrepresentation.  Count 4 alleges that Defendants negligently made false statements that induced them to invest in the Income Collecting Fund.  Count 5 alleges that the false statements led Mosaic Financial to keep its investments in the fund.  Again, the parties address Plaintiffs' holder and purchaser claims together, so the Court does so as well.

To state a claim for negligent misrepresentation, a plaintiff must allege: (1) the defendant, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest; (2) supplies false information; (3) for the guidance of others in their business transactions; (4) where those others

46

experience pecuniary loss caused by justifiable reliance on that information; (5) and he fails to exercise reasonable care or competence in obtaining or communicating the information. *Abboud v. Liberty Mut. Ins. Grp., Inc.*, 711 F. App'x 773, 777 (6th Cir. 2017) (quoting *Delman v. City of Cleveland Heights*, 41 Ohio St. 3d 1, 4, 156, 534 N.E.2d 835, 838 (1989)).

Defendants argue that Plaintiffs' claim for negligent misrepresentation fails as a matter of law because Plaintiffs fail to allege facts showing that: (1) Mutual Shareholder Services or any of its employees owed them "any special or fiduciary duty," (2) Defendants proximately caused their damages, and (3) the individual Defendants committed any specific act or omission establishing "a breach of a legally recognized duty." (ECF No. 18-1, PageID #145 & 147.)

### III.A. Duty and Special Relationship

As Plaintiffs note, a "special relationship" is not a separate element of negligent misrepresentation. *Abboud*, 711 F. App'x at 777; *see also* Restatement (Second) of Torts § 552(1). Instead, the Ohio Supreme Court interprets the requirement that a defendant supplies information for guidance in business transactions to mean that the plaintiff must be a member of a limited class of people who foreseeably rely on the defendant's representations. *Haddon View Inv. Co. v. Coopers & Lybrand*, 70 Ohio St. 2d 154, 157, 436 N.E.2d 212, 214–15 (1982). Usually, this situation arises where a defendant is a professional, such as an accountant, who is "in the business of rendering opinions to others for their use in guiding their business." *Picker Int'l, Inc. v. Mayo Found.*, 6 F. Supp. 2d 685, 689 (N.D. Ohio 1998).

47

Under Ohio law, the determinative question is whether the plaintiff belongs to a "faceless or unresolved class of persons" or "a known group possessed of vested rights, marked by a definable limit and made up of certain components." *Haddon View*, 436 N.E.2d at 214 (quoting *White v. Guarente*, 43 N.Y.2d 356, 361, 401 N.Y.S.2d 474, 372 N.E.2d 315, 319 (1977)).  Those who speak "in the course of [their] business, profession or employment, or in any other transaction in which [they have] a pecuniary interest" have a duty only to the latter.  *Abboud*, 711 F. App'x at 777 (quoting *Delman*, 534 N.E.2d at 838).  Because the class of potential plaintiffs is limited, the focus is on whether such a plaintiff's reliance was foreseeable.  *Haddon View*, 436 N.E.2d at 215.

Most recently, the Sixth Circuit addressed this tort under Ohio law in *Ohio Police & Fire Pension Fund v. Standard & Poor's Financial Services LLC*, 700 F.3d 829 (6th Cir. 2012), a State-law securities case that also included a claim for negligent misrepresentation.  There, investment banks paid the defendant a fee to assess the risk of certain mortgage-backed securities, but the defendant only earned its fee if it issued the desired rating.  *Id.* at 833–34.  The Sixth Circuit concluded that the plaintiff—a fund that purchased mortgage-backed securities and experienced losses related to the 2008 financial crisis—was part of the faceless investing public and not a "limited class" as Ohio law requires.  *Id.* at 841.  Under this standard, a simple consumer transaction will generally not satisfy the requirement for a special relationship, either.  *See Meta v. Target Corp.*, 74 F. Supp. 3d 858, 865 (N.D. Ohio

48

2015); *Miller v. Kent Nutrition Grp.*, No. 1:15-cv-2116, 2016 WL 11246420, at *9–10 (N.D. Ohio Sept. 16, 2016).

Defendants dispute the existence of a special relationship because "Plaintiffs are sophisticated parties who interacted with the [Income Collecting] Fund at arms' length." (ECF No. 18-1, PageID #146.) Defendants argue that, because they only had a contract with the fund, and not directly with Plaintiffs, "it is not reasonably foreseeable by the vendor that a customer of the company, who later receives the report, will rely upon the report." (ECF No. 21, PageID #235 (emphasis removed).) Plaintiffs respond that the complaint adequately alleges that they are part of the limited and known group of persons relying on the net asset value reports, because they were the only investors in the GOVBX share class. (ECF No. 20, PageID #214.) Moreover, Plaintiffs argue that "Defendants cannot really be confused as to the use that investors make of (supposedly reliable, third-party) information about the performance and value . . . of their investments." (*Id.*, PageID #215.)

Here, the allegations in the complaint show that Mutual Shareholder Services (and its employees) served as an SEC-registered transfer agent and fund administrator, in the business of rendering reports and providing information to others for their use in guiding their investments, that Defendants allegedly supplied Plaintiffs with false statements regarding the GOVBX share class in the Income Collecting Fund, and that Plaintiffs, the only shareholder in that class, are members of a limited identifiable group who relied on those statements. If proved, these

49

allegations show a special relationship.  *See Haddon View*, 436 N.E. 2d at 215; *Gutter v. Dow Jones*, 22 Ohio St. 3d 286, 288–89, 490 N.E.2d 898, 900–01 (1986).

Defendants' arguments miss the mark.  Whether or not they reasonably foresaw that Plaintiffs would rely on the net asset value reports simply does not determine the legal analysis under the special-relationship test Ohio uses to police the boundaries of this tort.  Nor does the sophistication of the plaintiff necessarily determine the matter.  In any event, given the relationship between the Income Collecting Fund and Defendants, who were in privity, Plaintiffs "could reasonably be expected to rely on information" provided by Defendants.  *See Ohio Police & Fire Pension Fund*, 700 F.3d at 841 (collecting cases).

Contrary to Defendants' position, Plaintiffs lack of privity with Defendants through a contract does not affect the sufficiency of their pleadings.  Ohio courts limit recovery under a theory of negligent misrepresentation where business entities have a contract "to protect against economic loss," because in that situation, "contract principles override tort principles, and economic damages are not recoverable except as provided in the contract."  *Universal Contracting Corp. v. Aug*, 2004-Ohio-7133, ¶¶ 18–20 (Ohio Ct. App.); *see also Textron Fin. Corp. v. Nationwide Mutual Ins. Co.*, 115 Ohio App. 3d 137, 150–51, 684 N.E.2d 1261, 1269–71 (1996).  Here, Plaintiffs and Defendants have not contracted to protect against economic loss.  Therefore, Plaintiffs' recovery can be based only in tort.  Indeed, they bring no contract claim or quasi-contract claim.

### III.B. Proximate Cause

Under Ohio law, the elements of fraud and negligent misrepresentation are similar.  The same allegations and law already discussed regarding proximate cause also support the causation element of Plaintiffs' negligent misrepresentation claims.  *See Martin v. Ohio State Univ. Found.*, 139 Ohio App. 3d 89, 104, 742 N.E.2d 1198, 1209 (2000).

### III.C. Liability of Individual Defendants

Next, Defendants challenge the sufficiency of Plaintiffs' allegations against the individual Defendants—Mr. Getts, Mr. Anastasi, and Mr. Milcinovic—because Plaintiffs fail to "adequately specify" each defendant's "discrete acts or omissions." (ECF No. 18-1, PageID #147.)  Plaintiffs allege that, under Ohio law, "a corporate agent acting within his scope of employment may be held personally liable for his own tortious actions."  (ECF No. 20, PageID #215 (citing *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999).)  Defendants respond that the holding in *Carter-Jones* is limited to liability for an "officer if he is 'actively involved' and 'intimate[ly]' participates in the wrongful conduct."  (ECF No. 21, PageID #236 (quoting *Carter-Jones*, 166 F.3d at 846).)

Under Ohio law, a corporate officer "may not be held liable merely by virtue of his status as a corporate officer."  *Roberts v. RMB Ents., Inc.*, 197 Ohio App.3d 435, 2011-Ohio-6223, 967 N.E.2d 1263, ¶ 35 (citations omitted).  Therefore, the allegations must demonstrate that the corporate officer "specifically directed the particular act to be done, or participated, or co-operated therein."  *Id.*

51

The complaint fails to allege the specific conduct on the part of Mr. Getts necessary to hold him personally liable for negligence.  Mr. Getts was the owner of Mutual Shareholder Services and its Chief Compliance Officer.  (ECF No. 1, ¶ 49, PageID #15.)  Plaintiffs allege that the company's compliance manual created duties for Mr. Getts to ensure that the company complied with State and federal law.  (*Id.*) But there is no allegation that Mr. Getts "specifically directed" the preparation or delivery of the net asset value reports or that he "participated" in reviewing or reconciling that data.  *Roberts*, 967 N.E.2d at ¶ 35.  Plaintiffs cannot hold Mr. Getts personally liable by virtue of his position at MSS without other specific allegations of misconduct.

In contrast, the complaint alleges that Mr. Anastasi and Mr. Milcinovic had personal involvement in the preparation of the net asset value reports.  According to the complaint, Mr. Anastasi and Mr. Milcinovic created daily net asset value reports detailing the "holdings, . . . value, custody, collateral, and change in position" of the Income Collecting Fund's GOVBX share class.  (*Id.*, ¶ 209, PageID #51; *id.*, ¶ 129, PageID #33; *see also id.*, ¶¶ 50–51, PageID #15.)  Additionally, Mr. Anastasi's name appeared in the metadata of some of the reports and he allegedly helped to calculate the trial balance of the fund.  (*Id.*, ¶¶ 22 & 50, PageID #8 & 15.)  At the pleading stage, these allegations suffice to state a claim against these individual Defendants.

Finally, Defendants argue that, because Plaintiffs fail to allege that Mr. Milcinovic was an officer of Mutual Shareholder Services, the negligent misrepresentation claims against him should fail.  Plaintiffs allege that

Mr. Milcinovic was a "Mutual Fund Administrator." (*Id.*, ¶ 51, PageID #15–16.) Defendants do not provide a definition of a "corporate officer" under Ohio law or any argument why Mr. Milcinovic's position would not render him an officer of Mutual Shareholder Services. Nor do Defendants provide any authority holding that a corporate employee cannot be held personally liable for his own torts. Generally, "[a] tort victim is entitled to recover from the agent as well as the principal" for its alleged injury. *See Lepera v. Fuson*, 83 Ohio App. 3d 17, 23, 613 N.E.2d 1060, 1064 (1992) (citing *Stuart v. National Indem. Co.*, 7 Ohio App. 3d 63, 67, 454 N.E.2d 158, 163 (1982)). Defendants fail to provide a basis on which the Court could conclude, as a matter of law, that Mr. Milcinovic was not a corporate officer or that he is shielded from personal liability.

*   *   *

Taking the allegations as true and construing them in Plaintiffs' favor, Plaintiffs state claims for negligent misrepresentation against Mutual Shareholder Services, Mr. Anastasi, and Mr. Milcinovic, but not Mr. Getts.

## IV.    Breach of Fiduciary Duty (Count 6)

Defendants argue that Plaintiffs' claim for breach of fiduciary duty fails as a matter of law because Mutual Shareholder Services served as the Income Collecting Fund's "transfer agent and back-office accounting provider" with "no direct relationship with either Plaintiff." (ECF No. 18, PageID #148.) They also argue that Plaintiffs fail to plead causation. Plaintiffs counter that Defendants' argument rests on their iteration of the facts and ignores specific allegations from the complaint that demonstrate Defendants owed Plaintiffs a fiduciary duty.

53

Under Ohio law, the elements of a breach of fiduciary duty are:  (1) existence of a fiduciary duty; (2) the failure to observe that duty; and (3) an injury proximately caused by the failure to observe that duty.  *Strock v. Pressnell*, 38 Ohio St. 3d 207, 216, 527 N.E.2d 1235, 1243 (1998).  A fiduciary duty involves "a relationship in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust."  *Groob v. KeyBank*, 108 Ohio St. 3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 16 (citation and internal quotation marks omitted).

One party cannot unilaterally turn the other into a fiduciary simply by reposing trust in them.  *Cairns v. Ohio Sav. Bank*, 106 Ohio App. 3d 644, 649, 672 N.E.2d 1058, 1062 (1996).  A fiduciary relationship exists only where "both parties understand that a special trust or confidence has been reposed."  *Umbaugh Pole Bldg. Co. v. Scott*, 58 Ohio St. 2d 282, 286, 390 N.E.2d 320, 323 (1979) (collecting cases).

Plaintiffs proffer several circumstances that they allege give rise to a fiduciary duty:  (1) Mutual Shareholder Services was contractually obligated to provide the Income Collecting Fund with net asset value data and reconciliation calculations; (2) Mutual Shareholder Services provided that same data to Plaintiffs; (3) Mutual Shareholder Services directly communicated with Plaintiffs about the fund and their investments; (4) Mutual Shareholder Services knew that Plaintiffs relied on the net asset value reports for investment decisions.  (ECF No. 20, PageID #217.)  Also, Plaintiffs cite several examples where other courts have found a fiduciary relationship between a fund administrator and fund investors.  (*Id.* (citing *Pension*

*Comm. of Univ. of Montreal Pension Plan v. Banc of America Secs., LLC*, 446 F. Supp. 2d 163, 196–97 (S.D.N.Y. 2009); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 415 (S.D.N.Y. 2010)).)

Defendants counter with a case from North Carolina where the State trial court held that, as a matter of North Carolina law, a fund administrator did not owe fiduciary duties to investors after it "compiled information," performed "ministerial calculations," and provided that information to plaintiffs. *Bradshaw v. Maiden*, No. 14 CVS 14445, 2015 WL 4720387, at ¶ 56 (N.C. Super. Aug. 10, 2015). The court compared various decisions from the Southern District of New York, where some found a fiduciary duty between a fund administrator and investors, and others did not. *Id.* at ¶¶ 47–51. The court concluded that the plaintiffs failed to allege the existence of a fiduciary duty because the fund administrator exercised "little, if any, discretion in performing its duties." *Id.* at ¶ 56. Notably, the administrator had no independent duty to verify the fund's investments. *Id.* at ¶ 54.

Neither party contends that Ohio law typically treats the relationship between a shareholder and a fund administrator as fiduciary in nature. Ohio law requires "a fact-specific inquiry to determine whether a purported business relationship has evolved into a fiduciary relationship." *Sinclair v. Donovan*, No. 1:11-cv-00010, 2011 WL 5326093, at *10 (S.D. Ohio Nov. 4, 2011). With no Ohio case law directly on point, the Court declines to decide the question now. Additional factual development is necessary to allow the Court to decide whether Defendants owed Plaintiffs a fiduciary

duty.  As previously discussed, Plaintiffs' allegations satisfy proximate causation.  For these reasons, the Court denies Defendants' motion to dismiss Count 6.

## V.    Ohio Securities Fraud (Count 7)

The Ohio Securities Act provides a remedy for purchasers of securities in fraudulent transactions.  Section 1707.44(J) of the Ohio Revised Code provides that "[n]o person, with purpose to deceive, shall make, issue, [or] publish . . . any statement . . . as to the value of securities, or as to alleged facts affecting the value of securities, or as to the financial condition of any issuer of securities, when the person knows that the statement . . . is false in any material respect."  Secondary liability for securities fraud extends to "every person that has participated or aided the seller in any way in making such sale."  Ohio Rev. Code § 1707.43(A).  As a general principle, the statute's anti-fraud provisions must be liberally construed.  *In re Columbus Skyline Secs., Inc.*, 74 Ohio St.3d 495, 498, 1996-Ohio-151, 600 N.E.2d 427, 429 (1996).

Defendants contest application of the Ohio Securities Act because sale of the securities at issue occurred outside of Ohio.  Accordingly, they challenge the constitutionality of the Ohio Securities Act as applied to them, invoking the Dormant Commerce Clause's extraterritoriality principle.  Plaintiffs argue that the relevant elements of the securities transaction include Defendant's misconduct in Ohio.  (ECF No. 20, PageID #219.)

### V.A.    Extraterritoriality of the Ohio Securities Act

Extraterritoriality challenges are rare and difficult to prove.  *See Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1172 (10th Cir. 2015) (Gorsuch, J.) (describing extraterritoriality as "the most dormant" strand of dormant commerce

clause jurisprudence).  The Supreme Court most recently addressed extraterritorial application of State law in *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023).  Although it did so seven months before Defendants moved to dismiss, no party addressed that case in its papers—perhaps because the issue deeply divided the Supreme Court.  In rejecting an argument that the State law at issue there unconstitutionally applied extraterritorially, the Supreme Court noted that "many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior," and specifically listed State securities laws as among the sort of laws having such extraterritorial reach.  *Ross*, 598 U.S. at 374.

Accordingly, the Court reads *Ross*, at most, as reaffirming the high standard for succeeding on a claim of extraterritoriality under Dormant Commerce Clause jurisprudence.  A State statute has invalid extraterritorial effect where it controls commerce occurring wholly outside the boundaries of a State and exceeds the inherent limits of the enacting State's authority.  *Online Merchants Guild v. Cameron*, 995 F.3d 540, 553 (6th Cir. 2021).  First, courts examine whether application of the State law at issue (here, the Ohio Securities Act) has the "practical effect" of regulating commerce wholly outside its borders.  *International Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 645–46 (6th Cir. 2010) (holding that a State-imposed fee on milk processors did not violate the Dormant Commerce Clause because it applied evenly to in-State and out-of-State milk); *American Beverage Ass'n v. Snyder*, 735 F.3d 362, 373 (6th Cir. 2013) (holding that a Michigan law impermissibly regulated commerce outside its borders because the law required beverage companies

to include a Michigan-specific mark on their packaging and restricted the sale of those beverages only in other States with "laws substantially similar" to the Michigan law).

Contracts formed between citizens of different states implicate the regulatory interests of both States. *A.S. Goldmen & Co. v. New Jersey Bureau of Sec.*, 163 F.3d 780, 787 (3d Cir. 1999). "When an offer is made in one state, and accepted in another, [courts] recognize that elements of the transaction have occurred in each state, and that both states have an interest in regulating the terms and performance of the contract." *Id.* at 786–87 (holding that the extraterritoriality principle of Dormant Commerce Clause jurisprudence is not offended by applying a State's securities laws to a multi-state transaction so long as there is an "in-state component" to the transaction).

Ohio courts regularly apply the secondary liability provision of the statute to third parties with varying degrees of involvement in a securities transaction. *In re National Century*, 775 F. Supp. 2d at 884–85 (collecting cases) (recognizing that Section 1707.43 imposes liability on persons "who introduce investment opportunities, serve as conduits of information, act as intermediaries in the exchange of money and securities, and arrange meetings between buyers and sellers").

Indeed, the text of the Ohio Securities Act is interpreted broadly to afford protection to investors in many different fraudulent scenarios. *See Johnson v. Church of the Open Door*, 2008-Ohio-6054, 902 N.E.2d 1002, ¶¶ 22–23 (Ohio Ct. App. 2008) (quoting *Federated Mgmt. Co. v. Coopers & Lybrand*, 137 Ohio App. 3d 366, 391, 738 N.E.2d 842 (2000)).  Under the statute, an "offeror" encompasses those who

"participate in any way" in making an offer, Ohio Rev. Code § 1707.01(W), and a "sale" includes actions completed by agents related to "an attempt to sell" or an "offer to sell securities." *Id.* at § 1707.01(C)(1).  Also, the Act defines "fraud" to include "any act, practice, transaction, or course of business relating to the purchase or sale of securities that is fraudulent or that has operated . . . as a fraud upon the seller or purchaser." *Id.* at § 1707.01(J).

Here, Plaintiffs alleged that the actions of Mutual Shareholder Services constituted part of the securities transaction and that those actions have a nexus to Ohio.  Plaintiffs allege that Mutual Shareholder Services, an Ohio corporation, created false net asset value reports in Ohio in relation to the purchase and sale of securities outside the State.  Plaintiffs allege that Defendants misrepresented the value of the securities in connection with Plaintiffs' transactions with the fund.  If true, these allegations could support a finding that Mutual Shareholder Services sufficiently participated in the securities transactions to be an "offeror," participated in the "sale" of securities, and committed "fraud" against Plaintiffs, under the broad terms of the Ohio Securities Act.

Development of the record through discovery might plausibly show that the conduct of Mutual Shareholder Services has a sufficiently in-State component. Depending on the facts, application of the Ohio Securities Act to this case would not have the "practical effect" of regulating commerce wholly outside of Ohio.  *Boggs*, 622 F.3d at 645–46.  And application of the Act would remedy fraudulent activities that constitute the "in-state component" of an out-of-state securities transaction,

committed by an Ohio corporation in Ohio.  *A.S. Goldmen & Co., Inc.*, 163 F.3d at 787.  Therefore, the Court cannot say at the pleading stage that extraterritorial application of the Ohio Securities Act violates the Dormant Commerce Clause.

### V.B.  Balancing

If a statute does not have impermissible extraterritorial reach, courts traditionally turn to the balancing test established in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  *Cameron*, 995 F3d at 552.  That test requires the Court to apply the statute "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."  *Pike*, 397 U.S. at 142.  In *Ross*, however, three Justices rejected *Pike* balancing.  *See* 598 U.S. at 377–87 (Gorsuch, J., joined by Thomas, J., and Barrett, J.).  Other disagreed.  (Sotomayor, J., joined by Kagan, J.)  And four Justices concurred in part and dissented in part on that issue.  (Roberts, C.J., joined by Alito, J., Kavanaugh, Jr., and Jackson, J.)

Whatever the viability of *Pike* balancing after *Ross*, application of the Ohio Securities Act easily withstands such analysis here.  Securities laws provide one example of the types of laws whose extraterritorial application does not generally offend the Constitution.  *Ross*, 598 U.S. at 374.  And because Ohio has an interest in at least part of the transactions at issue, the Court cannot substitute its judgment for that of the Ohio legislature or say that any burden on interstate commerce (Defendants identify none) clearly exceeds the local benefits deriving from Ohio's interests.

### V.C.  *National Century*

Finally, Defendants rely heavily on the Southern District of Ohio's decision in *In re National Century Financial Enterprises Inc., Investment Litigation*, 755 F. Supp. 2d 857, 884 (S.D. Ohio 2010).  (ECF No. 18, PageID #151.)  In *National Century*, the court declined to apply the Ohio Securities Act against a New York corporation, Credit Suisse, which was working with placement agents to sell securities issued by an Ohio corporation with institutional buyers outside Ohio.  When the Ohio corporation collapsed, the buyers alleged that Credit Suisse had secondary liability for violations of the Ohio Securities Act because it "participated in or aided the seller in any way in making such sale."  *Id.* at 860–61.

Credit Suisse challenged application of the Ohio Securities Act, arguing that it had impermissible extraterritorial application as applied.  In assessing the extraterritorial effect, the court adopted a "transactional test" focusing on the location of the transaction, not the fraud.  *Id.* at 884.  The court held that application of the Ohio Securities Act to the transaction at issue was unconstitutional because the place of contracting was not Ohio, performance did not occur in Ohio, and no offer of securities originated in Ohio.  The only connection to Ohio was issuance of the securities by an Ohio company.  *Id.* at 880.  In barring a remedy under Ohio statute, the court held that "[t]here is nothing unfair about the [buyers] not having a cause of action under the Ohio Securities Act when they purchased notes outside of Ohio from a seller in New York. They knew they were purchasing the notes from Credit Suisse and not from [the Ohio corporation]."  *Id.* at 886.

61

Assuming *National Century* continues to have persuasive value after *Ross*, Defendants' reliance on it is misplaced. As Plaintiffs note, the Southern District ruled on summary judgment after "a full factual record had been developed." (ECF No. 20, PageID #219 & #220.) Ultimately, deciding whether the Ohio Securities Act will have impermissible extraterritorial effect depends on and will benefit from a more complete factual record.

One last point. In reply, Defendants attempt to shift the burden to Plaintiffs to cite a "case upholding the application of the Ohio Act where, like here, the seller and purchaser were located outside the state." (ECF No. 21, PageID #241.) At this stage of the proceedings, however, Defendants bear the burden because they moved to dismiss. Nothing in the Rule 8 pleading standard obligates Plaintiffs to come forward with case law supporting their allegations or theories.

For all these reasons, the Court **DENIES** Defendants' motion to dismiss Count 7.

## VI. Utah Securities Fraud (Count 8)

Defendants move to dismiss Plaintiffs' claim under the Utah Uniform Securities Act because the sale of shares fell outside the statute's territorial scope and Mutual Shareholder Services is not a "seller" or "agent" within the meaning of the statute. (ECF No. 18-1, PageID #152–53; ECF No. 21, PageID #242–43.) In a footnote, Defendants challenge Accuvest's standing to assert a claim under the statute because Accuvest is not a "buyer." (ECF No. 18, PageID #153 n.2.) Plaintiffs argue that (1) their complaint satisfies the territoriality provision because Accuvest is in Utah and advised Mosaic Financial's securities purchases, and (2) the statute

extends liability beyond sellers of securities to also include those who aid and abet securities fraud.  (ECF No. 20, PageID #220–21.)

### VI.A.  Accuvest's Utah Securities Act Claim

In a footnote, Defendants argue that Accuvest lacks standing to assert a claim under the Utah Securities Act because it was not a "buyer" of securities.  (ECF No. 18, PageID #153 n.2.)  Two points merit discussion before addressing the merits of this argument.  First, arguments relegated to footnotes and stated in a "perfunctory manner, unaccompanied by some effort at developed argumentation," are usually waived.  *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006).  Here, however, Defendants' argument mirrors their analysis of Accuvest's ability to bring a claim under federal securities law.  Because this argument is developed elsewhere in Defendants' motion, the Court will consider it.  Second, the Court construes Defendants' argument under the Utah Securities Act as a *Lexmark* challenge to Accuvest's ability to bring a cause of action under the statute and not a challenge to Accuvest's standing, as previously discussed.

The Utah Uniform Securities Act parallels the Federal Securities Exchange Act.  *See Wenneman v. Brown*, 49 F. Supp. 2d 1283, 1290 (D. Utah 1999) (comparing Utah Code Ann. § 61-1-1 and Section 10-b).  The Utah statute compels courts to construe it "to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of [the Utah Uniform Securities Act] with the related federal regulation."  Utah Code Ann. § 61–1–27.

63

Based on the allegations in the complaint, Accuvest cannot assert a cause of action under the Utah Act, because it may not seek a remedy under federal securities law. This is so because the "remedy under [Section 61-1-22] is limited 'to the person . . . buying the security.'" *Levitz v. Warrington*, 877 P.2d 1245, 1246 (Utah Ct. App. 1994) (quoting Utah Code Ann. § 61-1-22(4)). In *Levitz*, the court declined to extend the remedy afforded by Section 61-1-22(4) to the plaintiff because he was merely a "potential purchaser" of securities, not an actual purchaser. *Id.* at 1247; *see also Melnyl v. Consonus, Inc.*, 2:03-cv-00528, 2005 WL 2263950, at *7 (D. Utah Sept. 12, 2005). In doing so, the court explained that this interpretation accords with the Supreme Court's interpretation of federal securities law. *Levitz*, 877 P.2d at 1246 (citing *Blue Chip Stamps*, 421 U.S. at 754–55). As previously discussed, Accuvest does not have a remedy under federal securities law because it was not an actual purchaser of securities. For this reason, Accuvest cannot assert a claim under the Utah Securities Act.

### VI.B. Mosaic Financial's Utah Securities Claim

Defendants raise a territoriality challenge to application of the Utah Securities Act and allege that Plaintiffs cannot assert claims against them because Utah has no connection to the actual sale of securities, Mutual Shareholder Services is not a seller under the statute, and under a theory of secondary liability, they were not "agents" of Abarbanel and the Income Collecting Fund. (ECF No. 18, PageID #152; ECF No. 21, PageID #241–44.) Plaintiffs argue that they satisfy the statute's territoriality requirement because "Accuvest, a Utah domiciliary, received and relied upon the [Income Collecting Fund's] prospectuses" when advising Mosaic Financial on its

64

investments.  (ECF No. 20, PageID #221.)  Additionally, "by disseminating materially false and misleading NAV Reports on behalf of the Income Collecting Fund . . . MSS acted as the Income Collecting Fund's agent and materially aided the Income Collecting Fund's fraud."  (ECF No. 18-1, PageID #153 (citing ECF No. 1, ¶ 290, PageID #66–67).)

The Utah Uniform Securities Act limits the application of Sections 61-1-1 and 61-1-22 to "persons who sell or offer to sell [securities] when . . . an offer to sell is made in [Utah] . . . or an offer to buy is made and accepted in [Utah]."  Utah Code Ann. § 61-1-26(1)(a)–(b).  An offer to buy or sell is made in Utah when the offer "originates" from Utah or "is directed by the offeror to [Utah] and is received."  *Id.* § 6-1-26(3)(a)–(b).  Plaintiffs argue that the prospectuses sent to them constitute "offers" that were directed toward Accuvest in Utah.  (ECF No. 20, PageID #220.) Defendants counter that no allegations support the proposition that the prospectuses "convey[ed] definite and unambiguous offers to sell securities."  (ECF No. 21, PageID #242.)

The statute defines "offer" and "offer to sell" as an "attempt or offer to dispose of, or solicitation of an offer to buy, a security interest in a security for value."  Utah Code Ann. § 61-1-13(bb)(ii).  A "prospectus" is a term of art referring to a document that "solicit[s] the public to acquire securities."  *Gustafson v. Alloyd Co.*, Inc., 513 U.S 561, 569 (1995).  In the complaint, Plaintiffs allege that the prospectuses described the Income Collecting Fund's investment strategy and the role of Mutual Shareholder

Service in the investment scheme.  (ECF No. 1, ¶¶ 85–88 & 104–08, PageID #22–23 & #26–27.)

Defendants do not address the statutory definition of an offer and instead rely on Utah common-law principles.  But they cite no case law holding that an "offer" under the Utah Uniform Securities Act cannot be made to a third-party investment advisor, who then advises their out-of-State clients to purchase securities.  Still, to the extent Plaintiffs' claims turn on an offer to Accuvest in Utah, they are too attenuated to support liability to Mosaic Financial under Utah law.  Therefore, the Court need not address the parties' respective arguments regarding whether Utah law treats Mutual Shareholder Services as an agent of the Income Collecting Fund.

## VII.  Leave to Amend

At the end of their brief, Plaintiffs request leave to amend if "the Court concludes that any part of the Complaint should be dismissed."  (ECF No. 20, PageID #222.)  Plaintiffs fail to attach any proposed amendment or to identify with any specificity what allegations they might wish to amend.  Defendants urge that amendment is futile.  (ECF No. 21, PageID #244.)  But the Court need not consider this argument or Plaintiffs' argument for amendment, which is not procedurally proper.

Procedurally, Rule 15 generally directs a court to give leave to amend freely.  Fed. R. Civ. P. 15(a)(2).  However, perfunctory amendment requests at the end of a brief are inadequate.  *See Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 305 (6th Cir. 2011).  "[A] request for leave to amend, almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss

is not a motion to amend." *Alexander v. Eagle Mfg. Co.*, 714 F. App'x 504, 511 (6th Cir. 2017) (cleaned up).  And an amendment request in a brief opposing a Rule 12 motion does not constitute a proper motion.  *Begala v. PNC Bank*, 214 F.3d 776, 784 (6th Cir. 2000).

Plaintiff has not separately moved for leave to amend or proffered a proposed amended complaint.  Indeed, in light of the Reform Act's discovery stay, and the volume of information already available to Plaintiffs through the criminal and SEC proceedings involving Abarbanel (*see* ECF No. 1, ¶ 206, PageID #51), it is difficult to see what additional facts Plaintiffs might add to their sixty-seven page, 291-paragraph complaint that would make a difference in the disposition of Defendants' motion.  And proceeding as Plaintiffs propose would transform the Court's ruling into little more than an advisory opinion instructing Plaintiffs how to plead their claims.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion to dismiss.  Specifically, the Court concludes that Accuvest may not recover under federal securities law, Plaintiffs fail to state a claim against Mr. Getts in Count 4 and Count 5; and Plaintiffs fail to state a claim under Utah securities law.

**SO ORDERED.**

Dated:  February 18, 2025

_____
               J. Philip Calabrese
               United States District Judge
               Northern District of Ohio